Millard, J.
 

 Pursuant to the terms of a written trading agreement of the parties to this action entered into January 5,1928, for the exchange of real and personal property, each of the contracting parties transferred to the other, hy proper written instruments, the properties described in the contract. Alleging misrepresentation as to the quantity of standing timber on the land traded to them' under the exchange agreement, plaintiffs instituted this action for the recovery of damages. The cause was tried to the court, sitting without a jury, and resulted in a judgment in favor of the plaintiffs. The defendants appeal.
 

 In December, 1927, H. O. Hodges, representing himself as the owner of three hundred and twenty acres of timber land and a shingle mill near lone, in Pend Oreille county, entered into negotiations through the real estate firm of Ciernan
 
 &
 
 Williams Company, of Yaldma, with D. R. Moise for the exchange of the timber land and mill for an ice plant owned by Moise in Toppenish. The testimony is conflicting as to whether Hodges . represented that the quantity of standing
 
 *591
 
 timber, cedar and white pine, was ten or twelve million feet. Appellants admit that H. C. Hodges represented that the amount of timber on the tract was approximately ten million feet. They contend that the exchange of the properties was conditioned upon inspection and approval by Moise of the Pend Oreille property and upon inspection and approval of the Moise ice plant by Hodges’ son Kenneth, an experienced ice factory operator.
 

 Moise, his son and a Mr. "Williams went to lone, December 27, 1927, to inspect the timber and the mill. An inspection of the timber could not be made, inasmuch as the snow was soft and six or seven feet deep where the timber was located. Near the shingle mill, lived a Mr. McBride, who was employed by Hodges to take care of the property. McBride had been informed by Hodges that, if he secured a buyer for the timber land, Hodges would pay him a good commission. McBride testified:
 

 “He said if you get a buyer for me and help me, or if you send any man up there or party to show them, and if you help me in making a trade or selling it I will pay you a good commission. He told me substantially this: that if any one come up there for me to represent to them that there was eleven or twelve million feet of timber.”
 

 Moise’s party called upon McBride, to whom Moise presented a letter of introduction from Hodges. That letter instructed McBride to show the property and to tell Moise what McBride knew about the property. McBride informed Moise that the amount of timber upon the land was from ten to eleven million feet; that there was no way of knowing the amount, as Mr. Hodges had purchased it upon the representation of Mr. Nicholson.
 

 Moise also conferred with a real estate dealer in
 
 *592
 
 Spokane who at one time had an option for the purchase of the Hodges land. The testimony is conflicting as to whether the real estate dealer told Moise that the option on the timber and mill was for ten thousand dollars and that Moise talked about a trade to the real estate dealer of the timber in the event that Moise acquired the same. On the return to Yakima, Williams and Moise advised Hodges that the weather conditions made it impossible to inspect the timber.
 

 Mr. Ciernan prepared a preliminary agreement for exchange of the property, but Moise would, not sign it unless Hodges guaranteed in writing the amount of timber on the land. Ciernan assured Moise that, in the execution of the final contract, the written guaranty would be made. The trading agreement was prepared in triplicate and signed in Seattle, January 5, 1928, by Henry C. Hodges and D. R. Moise and wife. By that agreement the respondents agreed to transfer to Henry C. Hodges an ice plant in Toppenish in consideration of two thousand dollars in cash and the conveyance to them of the Pend Oreille land and the personal property thereon. The purchase price of the ice plant was stated as thirty-seven thousand dollars, and the agreed value of the Pend Oreille property was thirty-five thousand dollars. At the time he signed the trading agreement, Moise insisted that he would not make the exchange with Hodges unless “it was put in writing’ as to the amount of timber on the land.5 ’ The testimony again sharply conflicts as to the understanding of the parties.
 

 It was orally agreed that a Mr. Ball should inspect the shingle mill machinery for Moise. Appellants contend that the inspection was to include the timber. Kenneth Hodges,-who had previously operated an ice factory, was to inspect the ice plant at Toppenish. On
 
 *593
 
 or about the middle of January, 1928, Moise, Ball and Williams visited the shingle mill near lone. They again talked to McBride about the timber, but they did not make an inspection or cruise of the timber. On his return to Yakima, Moise signed the following notation at the close of the trading agreement: “Above property inspected and oke’d.” Kenneth Hodges inspected the ice plant January 22, 1928, and indorsed the trading agreement: “Inspected and O. K.” Respondents insist that their inspection was confined to inspection of the mill machinery and that is all their approval
 
 covers;
 
 that appellants so understood at the time.
 

 An attorney of Yakima was selected as escrow holder to deliver the money and conveyances to the parties when the title to the respective properties was found to be merchantable, the transfer of the properties to be made as of February 1, 1928. The agreement was prepared, H. C. Hodges being named as the owner of the Pend Oreille property, he having so represented throughout the negotiations. On January 23, 1928, H. C. Hodges, the respondents, a son of respondents, Mr. Ciernan and Mr. Williams met at the office of the escrow holder to sign the escrow agreement which had been written prior to that date. H. C. Hodges then disclosed that he was the agent of his son Kenneth, who owned the Pend Oreille property. This necessitated the erasure of “H. C.” and the writing of “Kenneth” in the agreement. Moise would not sign the proposed escrow agreement until it was amended to show that he was to receive the amount of timber represented by H. C. Hodges to be on the land. He said:
 

 “No, this isn’t right here, our conversation is about buying timber, and not land, but timber. I was buying twelve million feet of timber and it was supposed to
 
 *594
 
 be put in this contract, it must be put in here, put in here in writing. I cannot make the deal otherwise, because I am buying timber, I won’t sign the contract and we won’t make a deal unless the timber is put in here in writing. ’ ’
 

 The escrow agreement, as amended and accepted by H. O. Hodges, incorporates in the description of the property transferred to the respondents by the appellants eight million feet of cedar and two million feet of white pine timber. The agreement was signed by D. E. Moise and “Kenneth Hodges by H. C. Hodges.”
 

 The exchange of the properties was consummated in February, 1928. Moise made some improvements on the mill and had the timber cruised. Discovering that the quantity of timber on the land was less than three million feet, respondents brought this action, which resulted in judgment in their favor for ten thousand seven hundred and fifty dollars.
 

 On the ground that the same was surplusage, the court on its own motion struck from the amended answer of Kenneth Hodges and wife the allegation that the properties of the parties, together -with the cash difference paid, were of approximately equal value. This is assigned as error.
 

 The doctrine of parity of value is not applicable. The contract of the parties was for the trade of one specific property for another specific property, not for the exchange of property for property of a value equal to a specified amount. The exchange agreement recited that the ice plant was of the value of thirty-seven thousand dollars, and that the timber land and mill were of the value of thirty-five thousand dollars, and by reason of the difference in value the respondents received two thousand dollars in cash from the appellants. Eespondents agreed to exchange their ice plant for two thousand dollars and the land and mill of ap
 
 *595
 
 pellants, if the quantity of timber upon the land was eight million feet of cedar and two million feet of pine as represented by appellants. We agree with appellants that the true measure of damages to be here applied is the difference between what the property is actually worth and what it would have been worth had it been as represented, a rule that needs no citation of authority to support it. It follows that the true measure of damages in this action is the difference between what the timber actually upon the land is worth and what would have been the value of the eight million feet of cedar and two million feet of pine had that amount been upon the land as represented.
 

 The assignment that the court erred in finding that Ciernan
 
 &
 
 Williams Company was agent for the appellants is without merit. Kenneth Hodges testified that his father, H. C. Hodges, was acting for him and his wife when H. C. Hodges signed the trading agreement and when he signed the contract, reading as follows, employing the broker:
 

 “I hereby ratify and confirm the employment of Ciernan & Williams Co., real estate brokers, to find and procure a purchaser for my property above described and in consideration of services performed by said real estate brokers in negotiating and bringing about the foregoing sale I hereby agree to pay said real estate brokers forthwith commission of $1,000.”
 

 The assignment that the court erred in not permitting a real estate broker to testify as an expert as . to the value of the standing timber is likewise without merit. While the witness was familiar with the location of the timber land in question and that and other timber lands had been listed with him for sale as a real estate broker, the witness had not made any sales of standing timber and was not in any way connected with the timber business; in fact, there was no show
 
 *596
 
 ing of experience qualifying the witness to testify as an expert on timber values. Other witnesses called by appellants were experienced in the lumber and shingle business and were permitted to testify as to timber values.
 

 Appellants next complain that the court erred in holding that exhibit “D” was a warranty or misrepresentation of a material fact. The court did not make any such formal finding. The exhibit is the escrow agreement. The court found:
 

 “That, before finally completing said exchange of said properties, plaintiffs insisted that a written representation should be made by defendants as to the amount of timber upon said premises in Pend Oreille county, and said defendant H. O. Hodges assented, and thereupon the escrow agreement in evidence herein as plaintiffs’ exhibit £D’ was executed by the parties, and plaintiffs executed and delivered to the escrow holder their deed to said real estate at Toppenish, Washington, together with a bill of sale of certain personal property as more particularly set forth and described in that certain instrument in evidence herein as Plaintiffs’ exhibit £K;’ and that thereafter and on or about the 1st day of February, 1928, said defendant Kenneth Hodges approved said escrow agreement and signed his name at the bottom of the last two paragraphs of said exhibit £D,’ with full knowledge of the facts in said exhibit £D’ contained.”
 

 The escrow agreement was very properly admitted in evidence. It is an important and final link in the chain of evidence establishing the fact of misrepresentation made by appellants as to the amount of timber on the land. H. C. Hodges agreed to the incorporation in the escrow agreement of the guaranty of ten million feet of timber upon the Pend Oreille land when respondents insisted that the exchange of properties would not be effected otherwise. Hodges was simply putting in writing a representation that appellants
 
 *597
 
 admit Hodges made to Moise at the very genesis of the negotiations that the quantity of timber was ten million feet. The testimony is overwhelming that, throughout the period of dickering, the respondents refused to make the exchange unless the amount of timber was guaranteed; and in reliance upon that representation respondents exchanged their ice plant for the timber land and the mill. At the time of the execution of the escrow agreement, it was first learned that H. C. Hodges was acting for his son Kenneth. By that agreement, the respondents obtained in writing a guaranty that the quantity of timber was ten million feet, the same representation that appellants concede they made orally to Moise when negotiations were initiated. With the view of the trial court we agree that the escrow agreement
 

 “. . . is by far the outstanding and most important witness so to speak in the case. In legal effect all the oral negotiations and conversations which had preceded its birth, all the inspections whatever they were made by each party of the others’ properties the so-called trade agreement in triplicate fall before exhibit ‘D.’ All these facts and incidents transpired before its signature and its date January 23,1928. It became in legal effect as to the contract rights of the parties their last and final act and record. All that has been said before was merged in it as the ultimate fact of agreement. In it was put down in black and white in its recitals in typewritten form that all concerned might read and know what it was that each contracting party should give the other and what it was that each party represented it had in ownership to give. On its date also there was brought into full light the relation that H. O. Hodges, the father of Kenneth Hodges, bore to the transaction, the true capacity in which he was acting. Theretofore it does not appear that anyone other than the Hodges could possibly have had the realization that H. O. Hodges was any other than an owner assuming and attempting to exchange his own.
 
 *598
 
 There now came to light and to the surface that H. O. Hodges was assuming to act in all the dealings on behalf of Kenneth Hodges not as owner but as an agent. Exhibit ‘D’ is a record of all these things made and executed as the final expression of the will of the interested parties. And to Exhibit ‘D’ Kenneth Hodges himself by his own hand granted his approval. . . . Plaintiffs took the lands of Kenneth Hodges with the representation that there was the quantity of timber of the species alleged. I am still of the opinion that even though it is in the form of recital in exhibit ‘D’ that statement as to the quantity of white pine and cedar is made, that it is just as much a statement of fact as though it appeared somewhere else in the instrument. . . . To me it is the most reasonable thing in the world that a man about to accept a transfer of timber in exchange for his going business when he had not been able to examine into that timber, to inspect it, should insist upon a representation, a statement in black and white, in print, as to how much of timber of a certain kind he was to get. That is but the method of careful, cautious man and certainly this record discloses that Moise was such.”
 

 It is next argued that the court erred in finding that the appellants represented to respondents prior and subsequent to the signing of the trade agreement that there were eight million feet of cedar and two million feet of pine on the land.
 

 Appellants admit that, at the beginning of the negotiations, H. O. Hodges represented to Moise that the amount of timber on the tract was approximately ten million feet. It is contended, however, that the representation was qualified by the statement that Hodges had never inspected the timber; that Hodges bought the land and mill from a Mr. Nicholson, who told Hodges of the amount of timber on the land; and that Hodges believed the representation made by Nicholson. In December, 1927, when Hodges represented to Moise that the quantity of timber on the land was ten
 
 *599
 
 million feet, Nicholson had been dead for two or more years. It is clear from Hodges’ testimony that he did not give the name of Nicholson as the source of his information with any idea that Moise might verify the statement made as to the amount of timber. The only purpose was to assure Moise that the timber was on the •land. Hodges testified:
 

 “Q. You told Mr. Moise in the presence of Mr. Williams, that there had been represented to you by Mr. Nicholson, that there was from ten to eight million feet of cedar and two million feet of other timber, part of which was white pine. A. That is the way I said it; yes, sir. Q. Did you make any further remark about that. A. I don’t remember. Q. Did you say anything about Mr. Nicholson? A. I don’t recall that I did. Q. Did you not say that you were acquainted with Mr. Nicholson and that you believed he was a successful business man and you believed his statement? A. I don’t think I did anything of that kind. We was just to start a trade and I expected this man to go up and see that timber and I had no other thought, except that he would go and see it. Q. Did you later on tell Mr. Moise that Mr. Nicholson was a successful business man and that you believed his statement to you? A. I never talked to Mr. Moise about it after that.”
 

 The guaranty incorporated in the escrow agreement is an unqualified representation that the amount of timber is ten million feet. The testimony is clear that the written statement was the same as had been made orally to Moise prior and subsequent to the date of the trading agreement. Relying on the representations of the appellants, the respondents made two trips to the shingle mill and the timber land. No inspection was made of the timber, a cruise being impossible because of weather conditions. Even if there had been such an inspection, the escrow agreement discloses that neither party relied thereon. Respondents insisted upon a
 
 *600
 
 clear-cut statement in writing as to the amount of cedar and white pine timber and that statement was made in the escrow agreement. The probable reason for respondents’ insistence upon that statement is because they had been unable to inspect and ascertain the quantity of timber on the land, and because a representation in unmistakable terms was desirable.
 

 Appellants cite the general rule that,
 

 “One who qualifies his representations by language indicating that it is made merely on information and belief, and who honestly believes such representation to be true, is not liable for its falsity. And this is especially true where the speaker in good faith gives the sources of his information so that the hearer may readily investigate for himself.” 26 O. J., 1130.
 

 That rule is not applicable to the facts in the case at bar. Nicholson had been dead for two years or longer. Appellants had owned the land for more than two years. According to their own statements, they had abstained from inquiring into the representations made to them by Nicholson. The circumstances are such that the law will impute to appellants actual knowledge of the matter spoken of. They must be presumed to have known the truth because they had full opportunities for knowing. Two years ’ period of ownership of the land in which to ascertain the amount of timber on the land is sufficient time in which to learn the truth. It was their duty to know the facts. By inducing the respondents to change their situation by means of representations which were false in fact, it .is no excuse for the appellants to say that they were ignorant of the falsity of their representations, or that they sincerely believed they were speaking the truth, under circumstances like those present in this case.
 

 The plea of appellants that they are entitled to recover by way of counterclaim four thousand dol
 
 *601
 
 lars, being the difference between the value of the ice plant as they found it to be (eighty-five hundred dollars) and its value (twelve thousand five hundred dollars) had it been as represented, can not be sustained. Appellants knew that the plant was eighteen years old when they made the exchange. The evidence does not support the allegation that the plant required more men and more coal to operate than respondents represented was required, nor is the contention that the plant did not produce as much ice daily as respondents claimed it would produce supported by proof. Kenneth Hodges inspected and operated the plant, which performed just as Moise said it would. As a steam-driven plant, one of appellants ’ expert witnesses testified that the old plant was in good condition. Desiring an electric plant, Kenneth Hodges, subsequent to the trial run of the old steam plant in February, expended six thousand dollars in the installation of new electric equipment and operated the plant for a year. There is no justification for the counterclaim. The position of the appellants is tersely summed up by the trial court as follows:
 

 “While legally speaking these defendants plead a counter-claim under all the testimony in the case it has branded itself a counter attack; it savors more of war than litigation.”
 

 We have examined the other assignments of error and find them to be without merit. The judgment is affirmed.
 

 Mitchell, O. J., Parker, Tolman, and Beals, JJ., concur.