[No. 22994. *En Banc.* October 27, 1931.]

W. P. GOODIN, *Respondent,* v. PALACE STORE COMPANY et al., *Appellants.*[1]

*Lund & Dodds,* for appellants.

*McCarthy & Edge* and *M. E. Jesseph,* for respondent.

MILLARD, J.—Alleging that he was induced by fraudulent representations of its president to purchase capital stock of the Palace Store Company when that corporation was insolvent, and that he did not discover the fraud practiced upon him until the corporation made an assignment for the benefit of creditors, the plaintiff brought this action against the corporation and its assignee to rescind the sale and for the return of the purchase-price of the capital stock. The trial of the cause resulted in judgment in favor of the plaintiff. The defendants appealed.

Appellants contend that respondent was not induced by false representations as to the soundness of the corporation to purchase capital stock therein; that respondent's transactions were not with the Palace Store Company, but with the corporation's president, who had no authority to bind the corporation; that no benefit was received therefrom and the transaction was *ultra vires,* therefore the corporation is not liable for any false representations made by its president.

The Palace Store Company, a domestic corporation which had operated a department store in Spokane for

more than eighteen years, on March 4, 1930, executed a common law assignment for the benefit of creditors to the Spokane Merchants' Association. The corporation had a capital stock of three hundred thousand dollars, divided into two thousand shares of common stock and one thousand shares of seven per cent preferred stock, each having a par value of one hundred dollars. George Phillips, the president and manager of the corporation, was in charge of the store from its opening until the corporation made an assignment for the benefit of its creditors. Mr. Phillips owned the controlling interest in the corporation.

The respondent, a railroad brakeman, was thrifty and had accumulated a considerable sum of money, yet his understanding of matters of a commercial nature was very limited. On or about October 1, 1929, he went to the Palace Store for the purpose of buying capital stock of the appellant corporation. Respondent testified that he desired to purchase the stock because the store for the past eighteen years was outstanding, and was reputed to be doing a good business. He was unacquainted with Mr. Phillips, whom he insisted upon seeing. The president took the respondent into a private office, where the two conversed one-half to three-quarters of an hour concerning the financial condition of the corporation. The testimony is conflicting as to what Mr. Phillips told the respondent. Respondent testified that he inquired of Mr. Phillips whether

"... he had any Palace Treasury Preferred Stock on hand, and he said that he had, and I told him I would like to have him explain about it, and if I thought it was a good investment I might invest in some of it. ... I had heard about Mr. Phillips quite a number of times. I never talked to anybody else. ... I made inquiry as to how the store was getting along, and he told me that the business was good and that they had always made money and made

good profits. He told me the store was in sound financial condition; . . . I told him that if he could assure me that it was a good safe investment that I could take about sixty shares.''

On October 8, 1929, respondent returned to the store and informed Mr. Phillips he was ready to take the stock. Respondent was informed at that time that only thirty-two shares could be delivered. Respondent's check for three thousand and fifteen dollars, payable to the Palace Store Company, was turned over to the company's president, who requested respondent to return that afternoon for the stock. On respondent's return, he was informed that the company could deliver only twenty-nine shares that day. The president suggested that respondent accept a note of the company for thirty-three hundred dollars for ninety days, with interest thereon at seven per cent per annum; that, at the end of that period, the remainder of the stock would be available. Respondent accepted the note, delivering to the president of appellant corporation his check payable to the corporation. On or about January 8, 1930, the remainder of the stock (making a total of sixty-four shares for which respondent paid fifty-eight hundred and eighty dollars) was delivered by the corporation's president to the respondent, and the note was cancelled.

Respondent testified that he was induced to make the purchase by the representations of Mr. Phillips, in whom he had great confidence; that Mr. Phillips told him on October 8, 1929, that the company was going to put over a big stock issue of something like two hundred thousand dollars for improvement and alterations and increase of stock; that he never knew until notice appeared in the press of the assignment that the ''Palace Store was not in good condition;'' that nothing was said to him at any time about going elsewhere

to buy stock; that he told Mr. Phillips, "I was a railroad brakeman, and wasn't familiar with the store business at all." It appears that, at the time of this transaction, and for sometime prior thereto, the corporation, acting through its president, had under consideration a readjustment of its financial structure and an increase of capital stock; that it had filed papers in the office of the secretary of state for that purpose.

The money paid by the respondent to the corporation was deposited in the bank account of the corporation and withdrawn from time to time on checks of the corporation. Respondent received a check from the corporation in January, 1930, for an amount representing the difference between fifty-eight hundred and eighty dollars paid out by the company for the purchase of the stock—the company purchased the stock on the open market, it not having for sale any treasury stock—and the six thousand and fifteen dollars paid by respondent to the corporation for the sixty-four shares of stock.

The corporation's president testified by deposition that the respondent visited him in October, 1929, and wanted to buy Palace Preferred stock; that he advised respondent to invest his money in some savings and loan association; that the corporation had no stock for sale, and he referred respondent to a broker; that respondent requested the president to buy the stock for him, with which request he complied, buying the stock on the open market with the money the respondent had entrusted to him for that purpose; that he told the respondent that the company had always paid its preferred stock dividend, but had passed the 1929 common stock dividend.

The president's story does not ring true. The corporation was insolvent at the time respondent purchased the capital stock. As to that fact, the parties

stipulated. Appellants will not be heard now to say that the corporation's president did not know that the corporation was insolvent at the time respondent purchased the stock. The corporation lived and moved as directed by its president. If he did not have actual knowledge, the law will impute such knowledge to him. *Ronald v. Schoenfeld,* 94 Wash. 238, 162 Pac. 43.

We are convinced, as was the trial court, that the respondent was induced to purchase the stock in reliance on the president's misrepresentations as to the financial condition of the corporation, and in the belief that he was buying treasury stock. That constitutes fraud. It will not avail appellants to insist that no representations were made as to the financial condition of the corporation. The president knew that the corporation was insolvent—that knowledge is conclusively imputed to him—when inquiry was made as to the solvency of the corporation. There was either a non-disclosure of the condition of the corporation, a suppression of the fact of insolvency of the corporation—it was the president's duty to either tell the truth to the respondent or refuse to take his money—or there was an affirmative representation that the corporation was financially sound. Otherwise, the purchase would not have been made. The representation was made as to an existing fact; it was known to be false by the president, who made the representation. The respondent acted on that representation to his prejudice, and he was justified in accepting as true the statements of a man in the position of the corporation's president, the head of a business recognized for years as a financially sound institution.

"When it is sought to rescind a contract of subscription to or a purchase of stock on the ground of fraud, or to recover damages for the fraud, the courts, in determining what constitutes fraud, are governed by

substantially the same rules as apply in the case of other contracts and of contracts between natural persons. There is fraud, for the purposes either of rescission or of an action for damages, whenever there is a false representation of a material fact, or such a concealment or non-disclosure of a material fact as is equivalent to a false representation, made with knowledge of its falsity or recklessly and without knowledge as to its truth or falsity, and if it is of such a character that the party to whom it is made has a right to rely upon it, and it is in fact relied and acted upon by him to his damage or injury." 14 C. J., § 874, p. 602.

Respondent was not dealing with the president as an individual. He was dealing with Mr. Phillips as the executive of the corporation. His transactions were with the corporation. He refused to talk to any one other than the president... A corporation can act only through its officers and agents. The sale of the stock, the taking of respondent's money, was for the benefit of the corporation. The checks were made payable to the corporation. The money was deposited in the bank for the credit of the corporation. The corporation had the use of the money for a number of months prior to its purchase on the open market of stock for the respondent, who thought he was purchasing from the corporation treasury stock. The corporation received six thousand dollars of the respondent's money in October, 1929, at which time less than one-half of the shares of stock were delivered. Three months later the remainder of the stock was delivered to the respondent. During that period of time the corporation was using the respondent's money. All he received was worthless stock. He was induced by false representations of the corporation's president to purchase stock in an insolvent corporation. While the corporation was not engaged in the business of buying its own stock on the open market and delivering it to

customers, the corporation, through its agent, represented to the respondent that the corporation was selling to him treasury stock of the company. The act of the president was the act of the corporation.

The plea of *ultra vires* is unavailing. A corporation can not engage in an *ultra vires* transaction, receive benefit therefrom, and evade liability for a tort incident thereto committed by its agent. When an officer is permitted, as was the president in the case at bar, to exercise all of the powers of a corporation, the corporation will not be permitted to deny the authority of such officer to the prejudice of an innocent person.

"The corporation acts only through its agent. The fraud of the agent is the fraud of the corporation. But it is not alone by virtue of the law of agency that we hold the . . . Company answerable for these frauds, but for the additional and paramount reason that the same dominating power and control which dictated its affairs, and, in fact, brought about these transactions, was the overpowering influence of intercorporate management, which made the act of one the act of the other in the particular business here involved." *Madison Trust Co. v. Stahlman*, 134 Tenn. 402, 183 S. W. 1012.

"Where, without challenge by officers or stockholders of a corporation, an officer thereof has been permitted by the common consent of all other officers and stockholders, and by their acquiescence, to exercise all the powers of the corporation, and to conduct all its business for years, they and the corporation are estopped from denying to the prejudice and injury of innocent parties who have relied on the apparent authority of such an officer to act for and as the corporation, that he had the actual authority so to do." *Ratcliff v. Clendenin*, 232 Fed. 61.

"It is difficult to understand upon what ground the principal should be held liable for the *negligence* of his agent and not for his *fraud*, . . . Fraud . . . is generally considered one of the forms of gross negligence. . . . Does 'the scope' include

negligence and exclude fraud? . . . Tested by reference to the intention of the principal, neither negligence nor fraud is within 'the scope of the agency;' but tested by the connection of the act with the property and business of the agency, *fraud* in taking the very property is as much 'within the scope of the agency' as negligence. . . ." *Reynolds v. Witte,* 13 S. C. 5, 36 Am. St. 678.

Appellants next contend that the respondent cannot rescind after insolvency as against the assignee of the corporation.

The stock was purchased in October, 1929. Respondent did not participate in the management of the affairs of the corporation. He received no benefits by reason of his relation as a stockholder. There was nothing to place him on notice that the corporation was insolvent. He was not guilty of laches. In March, 1930, five months after his purchase, immediately upon learning through the press that the corporation had made an assignment for the benefit of creditors, the respondent instituted suit for rescission of the purchase.

A subscriber for the capital stock of a corporation may bring suit after insolvency of the corporation for rescission of his subscription if he has used due diligence and has not profited by the transaction or misled others to their detriment. That is, in a case of rescission for fraud, though the rescission is made subsequent to insolvency of the corporation and against the receiver or assignee, the trust fund doctrine has no application as to all existing creditors and as to all indebtedness incurred by the corporation prior to the subscription for the stock.

In *Atwood v. McKenzie-Waterhouse Co.,* 120 Wash. 214, 206 Pac. 978, 41 A. L. R. 650, which was an appeal from a judgment of dismissal upon the sustaining of

a demurrer to the complaint in an action to rescind a subscription for corporate stock, we said:

"As against a demurrer, we must construe the complaint to allege that there were no creditors who became such subsequent to the subscription. We are the more willing to so construe it because the case seems to have been presented here on that theory. It is necessary to determine the meaning of the complaint because it does not necessarily follow that appellant's rights against subsequent creditors are the same as those against prior creditors.

"In the argument here made it seems to be conceded that the complaint would be sufficient in a suit against the corporation as a solvent concern, but it is contended that, as against the receiver, it does not state facts sufficient to justify any relief.

"As a general proposition, it may be said that the capital stock of an insolvent corporation is a trust fund for the benefit of its creditors, and any unpaid subscriptions for the capital stock are assets of the corporation and a trust fund for the benefit of the creditors.

"It seems to be the established rule in England that a suit to rescind a stock subscription on the ground of fraud cannot be maintained by a subscriber for stock after proceedings have been taken to liquidate the affairs of the corporation on the ground of insolvency. The American courts have not generally adhered to the English doctrine in all its strictness. The weight of authority in America, especially by the more recent cases, is to the effect that he who has been induced by false or fraudulent representations to subscribe for capital stock of a corporation may rescind after the corporation has become insolvent and has been placed in the hands of a receiver, if he has not been guilty of laches in discovering the fraud practiced upon him and in repudiating the transaction after discovering the fraud, and has not in the meantime participated in the affairs and business of the corporation, and has not been guilty of any affirmative acts which might mislead others to their detriment, and no person has

become a creditor of the corporation after his subscription was made.

"There are some American cases which seem to hold that a subscription to capital stock, induced by fraud, cannot be rescinded after the insolvency of the corporation. *Howard v. Glenn*, 85 Ga. 238, 11 S. E. 610, 21 Am. St. 156; *Meholin v. Carlson*, 17 Idaho 742, 107 Pac. 755, 134 Am. St. 286; *Hinkley v. Sac. Oil, etc. Co.*, 132 Iowa 396, 107 N. W. 629, 119 Am. St. 564. These cases and others, as well as the English cases, are rested on the theory that, as soon as the corporation becomes insolvent, all of its assets, of whatsoever kind or nature, at once become a trust fund for the use and benefit of creditors. It seems to us that these cases lose sight of the fact that the trust fund doctrine is itself based on equitable principles, and that it should yield to equities which are superior. It seems to us that the equities of one who was induced by fraud to purchase capital stock and who used all due diligence thereafter to discover the fraud, and to rescind his contract, and who has not profited by the transaction, and who by his conduct has not misled others to their detriment, are certainly greater than those of a creditor who became such before the other's subscription to the capital stock. If that out of which the subscriber has been defrauded by the agents of the corporation be returned to him, the creditors who became such before he subscribed are in no worse position than they would have been in had the subscription not been made. Where, under these circumstances, the subscriber has not been at fault and has acted with diligence, it would be inequitable to permit the creditors to profit by his misfortune. These circumstances raise greater equities in him than are raised by the trust fund theory in the creditor."

In *Atwood v. McKenzie - Waterhouse Company*, *supra*, as in the case at bar, the sale was made after insolvency. The corporation in that case received a benefit as did the corporation in the case before us. What the corporation did with the money after receiving same is not a factor of importance. Respond-

ent was to receive treasury stock. Whether the stock he received was in fact treasury stock or stock purchased by the corporation from others and sold by the corporation to him as treasury stock, is not material. There is no difference in principle whether the stock was or was not treasury stock. In either event, it was worthless, and by the corporation known to be of little or no value when it received respondent's money therefor. We agree with the trial court that the corporation profited by the transaction. The trial court said:

"It is contended here by the defendant Palace Store, that they received no benefit whatever in this transaction, but I am hardly prepared to agree with that contention. Their deposits in the bank on the 8th day of October were swelled practically 100 per cent. Had this sum of money not been deposited to their credit on that date their deposit would have been around $6,000, but this deposit made it around $12,000 and for a period of five weeks, from October 8th to November 15th, they had the use and benefit of the $3,300 as a corporation, of this plaintiff's money, and up until January they had the use of some of it. The question as to whether or not the corporation received a benefit cannot be one of degree, it seems to the Court, but rather one of fact, and if they received benefits in any measure they would be liable. There is this other thought that occurs too—as I have already found, Mr. Phillips knew he had an insolvent corporation upon his hands, the fact is that through this transaction he was able to go to a stock broker and show some market for his preferred stock, was not only a benefit to him as an individual, but a benefit to the corporation. Then further, one of these transactions was where the sale of stock was recognized as being made direct to the corporation, and the corporation selling a like amount of stock to plaintiff. I refer to the transaction involving 5 shares of stock in November, I think it was.

"The record of the corporation introduced here, ought to be such that the Court could fully rely upon them, yet they are rather uncertain and unreliable, to illustrate; this sum of money received on the 8th day

of October was deposited in the general account of the corporation, and carried apparently on their books in another account known as the discount account for the full sum of $6,015. Then the record as produced here, I am unable to refer to it by exhibit number, referring to the employees account, shows that on the 11th day of December, 1929, more than two months following this transaction, this plaintiff had a credit in the employees account for the full sum of $6,015.00. Now, just how much that might add to the standing of the company, or how much it might detract therefrom, is not as material as is the fact that this sum of money for a considerable period of time was dealt with largely as a fund of the corporation, it seems to the Court.''

*Atwood v. McKenzie-Waterhouse Company, supra,* is cited with approval by the supreme court of Utah in *Burningham v. Burke,* 67 Utah 90, 245 Pac. 977, 46 A. L. R. 466.

This is not a case of recovery in specie the very money held in trust for the respondent. The respondent is entitled to judgment establishing his claim as a general creditor.

We have examined the authorities cited by appellants and find they are distinguishable on the facts from the case at bar.

The judgment should be, and it is, affirmed.

BEELER, PARKER, MAIN, MITCHELL, HOLCOMB, and HERMAN, JJ., concur.

TOLMAN, C. J. (dissenting)—In my opinion, the majority has misconstrued the effect of *Atwood v. McKenzie-Waterhouse Co.,* 120 Wash. 214, 206 Pac. 978, and has wholly misapplied the salutary rule there laid down.

In that case, the defrauded stock subscriber purchased the stock from the insolvent corporation, paying to it one thousand dollars in cash and giving it a note for nine thousand dollars additional. The action

was brought for the express and only purpose of rescinding the stock subscription, recovering back the money paid, and securing the cancellation or return of the note. Both the money and the note had passed to the corporation and were assets in its hands. The plaintiff therefore sought only the return to her of the assets wrongfully taken from her by the corporation after it had become insolvent, and in the event of recovery, she would not thereby reduce the trust fund belonging to the creditors of the corporation by a single penny.

Here the corporation received nothing from this plaintiff except that which it paid out in his behalf, and its assets are not increased a single iota by the transaction. Before the transaction took place, the corporation was insolvent, and under our trust fund doctrine, all of its assets were then a trust fund belonging to its creditors pro rata. How can we, because of the fraud of the president of the corporation, visit his iniquity upon the heads of the innocent creditors, and decrease their trust fund by permitting this plaintiff to share therein, without violating one of the very foundation principles of justice?

We are not here dealing with the corporation or with its officers, and we are in no wise concerned with any possible benefit which the corporation or its officers conceived there might have been for them in the transaction. We are dealing here wholly with a fund which became a trust fund before these transactions took place. It is stipulated that the Palace Store Company was insolvent on October 8, 1929, and so remained thereafter; which date long preceded the transactions giving rise to this litigation.

We have always regarded the assets of an insolvent corporation as a sacred trust fund belonging to the creditors from the moment insolvency existed as a

fact; and in various cases, we have clearly recognized that it is with the fund only that we are concerned. See *Terhune v. Weise,* 132 Wash. 208, 231 Pac. 954, 38 A. L. R. 94; *Smith v. National Bank of Commerce of Seattle,* 142 Wash. 428, 253 Pac. 644. So, then, bearing in mind that the court is concerned only with the proper application of a trust fund, it appears that, if respondent Goodin, after the assets became a trust fund, transferred his money to the corporation, he just as certainly withdrew that money from the corporation, and not one penny of his became and remained a part of the trust fund.

The fraud of the corporation or its officers is wholly immaterial unless, by reason thereof, some part of Goodin's money was induced to flow into the trust fund. There is here no question of subsequent creditors; and all those who will be affected were creditors prior to the Goodin transaction, and were then, and still are, beneficiaries of the trust fund.

Therefore, in my judgment, our natural sympathy for respondent should not blind us to the rights of the creditors, and he should not be recompensed at their expense.

In my opinion, the judgment should be reversed and the action dismissed.

BEALS, J., concurs with TOLMAN, C. J.