[No. 25589-8-II. Division Two. September 14, 2001.]

PATRICIA S. MICHAK, *Appellant*, v. TRANSNATION TITLE INSURANCE COMPANY, *Respondent*.

414

*Thomas F. Miller*, for appellant.

*James K. Sells* (of *Ryan, Sells & Uptegraft, Inc., P.S.*), for respondent.

MORGAN, J. — In this title insurance case, the issue is whether the insurer could change its preliminary commitment without telling its insured. The answer is no. Thus, we reverse the trial court's summary dismissal of the insured's complaint.

In the early 1990s, Brent C. Hart[1] owned a 40-acre tract of land in Kitsap County. He obtained ingress and egress by means of two easements, each 30 feet wide, that traversed servient tracts to the west. One easement was recorded under auditor's file number 7804180111, and the other was recorded under auditor's file number 7804180112. Each easement adjoined the other, so in effect Hart had one easement 60 feet wide.

On June 17, 1994, Hart released the 30-foot easement recorded under auditor's file number 7804180111. Someone recorded the release a few days later, according to an auditor's file stamp that appears on its face. Hart retained the 30-foot easement recorded under auditor's number 7804180112.

In June or July 1997, Patricia S. Michak agreed to buy Hart's land from Hart's bankruptcy trustee. Their agreement is not in the record.

On July 7, 1997, Transnation Title Insurance Co. issued a preliminary commitment for title insurance. In the insuring provisions, Transnation stated:

---

[1] Another owner was Mary Hart. For convenience, we refer only to Brent.

Transnation Title Insurance Company, an Arizona Corporation, herein called the Company, for a valuable consideration, hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A, upon payment of the premiums and charges therefor; all subject to the exceptions and conditions and stipulations shown herein, the Exclusions from Coverage, the Schedule B exceptions, and the conditions and stipulations of the policy or policies requested.[2]

In Schedule A, Transnation named Michak as proposed insured and legally described Hart's land, insofar as pertinent here, as "[t]he Northeast quarter of the Southeast quarter, Section 31, Township 27 North, Range 2 East, W.M., in Kitsap County, Washington[,]" together with "an easement for ingress and egress *60 feet in width* as described in documents filed *under Auditor's File Nos. 7804180111* and 7804180112[.]"[3] In Schedule B, Transnation excepted from coverage certain defects, liens and encumbrances, none of which is pertinent here. In a section titled "Commitment Conditions and Stipulations," Transnation stated:

2. If the proposed insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If

---

[2] Clerk's Papers (CP) at 6. The record does not show whether the seller or Michak paid Transnation's premium, so it also does not show whether Michak was a promisee or a third party beneficiary. The omission is immaterial because Transnation's duties were the same either way.

[3] *Id.* (emphasis added). The record shows that Transnation simply missed Hart's 1994 release of the easement recorded under auditor's number 7804180111. In its answer to Michak's complaint herein, Transnation admits discovering, "[s]ubsequent to issuance of the preliminary commitment* . . . that 30 feet of the 60-foot easement had been extinguished." *Id.* at 43 (emphasis added).

the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3[4] of these Conditions and Stipulations.[5]

After issuing its preliminary commitment, Transnation was informed by Hart's bankruptcy trustee that Hart no longer owned a 60-foot easement. Accordingly, Transnation issued, on August 1, 1997, a two-page document that we will refer to as "the supplemental." The first page was entitled "Supplemental No. 1 to the First Commitment" and stated that the legal description in the preliminary commitment "is amended as hereto attached."[6] The second page was untitled and contained only a three-paragraph legal description. That description was the same as the one in the preliminary commitment except in two respects: It omitted any reference to auditor's file number 7804180111, and it showed the width of the easement as 30, not 60, feet.

Transnation sent copies of the supplemental commitment to the seller and the seller's broker, but not to Michak.[7] According to Michak, whose version we must accept for purposes of this appeal,[8] she was not told of the supplemental at that time.

---

[4] Paragraph 3 stated, unremarkably, that Transnation's liability would be only to its insured; only for actual loss not exceeding policy limits; and subject to the conditions and exclusions set forth.

[5] CP at 7. The quoted paragraph appears only in the preliminary commitment. It is not reiterated in the final title policy that took effect after closing. It was apparently intended to apply between the preliminary commitment's issuance and the land sale's closing.

[6] *Id.* at 90.

[7] Transnation has not produced any evidence that it sent a copy of the supplemental to Michak.

[8] *N. Pac. Ins. Co. v. Christensen*, 143 Wn.2d 43, 47, 17 P.3d 596 (2001); *Hansen v. Friend*, 118 Wn.2d 476, 485, 824 P.2d 483 (1992).

The sale closed on August 8, 1997.[9] Michak was asked to sign, and did sign, a number of documents. She did not sign or initial the supplemental's first page, and she does not believe she saw that page. She did initial the supplemental's second, untitled page, which, according to her, she did not scrutinize. Accordingly, she failed to notice that Transnation had reduced the width of the easement.

On August 14, 1997, Transnation issued its final title insurance policy. The policy purported to insure an easement only 30 feet wide.

In early 1998, Michak began developing the property. She then learned for the first time, according to her, that her easement for ingress and egress might not be 60 feet wide. She asked Transnation to explain, and on or about February 18, 1998, she received—for the first time, according to her—a copy of the supplemental commitment.

On November 16, 1998, Michak filed this suit against Transnation. She alleged in part:

6. The Owners Policy of Title Insurance does not insure the same real property as described in the Commitment For Title Insurance. In particular, the easements [sic] for ingress and egress in the commitment for title insurance is a sixty-foot wide easement and in the owners policy of title insurance, the easement is only thirty feet wide. . . . [T]he easement under Auditor's file # 780480111 . . . is missing in the Owners Policy of Title Insurance.[10]

She concluded that Transnation had "breached its commitment for title insurance by failing to discover the easement that had been released[.]"[11]

On March 22, 1999, Transnation answered Michak's complaint. After admitting that it had issued an "owner's

---

[9] Transnation acted as escrow agent as well as title insurer. I omit that fact from the text because it is not material here. Michak claims only that Transnation breached its duty as title insurer.

[10] CP at 4.

[11] Id.

policy of title insurance . . . contain[ing] a different legal description than that contained in the preliminary commitment[,]" it alleged that Michak had "acknowledged receipt of that supplemental by initialing the revised legal description and supplemental document."[12] Based on that allegation, it prayed "that the above-entitled action be dismissed with prejudice."[13]

On October 14, 1999, Transnation filed a motion for summary judgment. On November 10, 1999, Michak filed a cross-motion for summary judgment. The trial court granted Transnation's motion, and Michak filed this appeal.

The appeal involves four questions, the last of which subdivides. (1) Did Transnation and Michak form an enforceable contract when Transnation issued its preliminary commitment and Michak paid the premium therefor? (2) Did the contract obligate Transnation to insure Michak's interest in a 60-foot easement? (3) Did the contract include a mechanism whereby Transnation could alter its preliminary commitment before closing? (4) Does that mechanism apply under the circumstances present here?

I

██ ██ The first question is whether Transnation and Michak formed a contract when Transnation issued a preliminary commitment in exchange for a premium. The answer is yes. A contract is formed when two parties enter into an agreement for valuable consideration,[14] and Transnation and Michak did that at the time of the preliminary commitment.

---

[12] *Id.* at 43.

[13] *Id.* at 44.

[14] *Yakima County Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388-89, 858 P.2d 245 (1993).

## II

■ The second question is whether the contract obligated Transnation to insure Michak's interest in a 60-foot easement for ingress and egress. Again, the answer is yes. In the insuring clause of its commitment, Transnation promised to insure Michak's ownership of "the estate or interest . . . described or referred to in Schedule A,"[15] subject to the policy's conditions, stipulations, and exclusions. In Schedule A, Transnation described a 60-foot easement for ingress and egress. Thus, Transnation promised to insure an easement of that width, subject to the policy's conditions, stipulations, and exclusions.

## III

■ The third question is whether the contract included a procedure whereby Transnation could alter its preliminary commitment before closing. Again, the answer is yes. In the preliminary commitment's second condition, quoted in full above, Transnation stated in pertinent part:

> 2. **If the proposed insured has or acquires actual knowledge of any defect. . . . or other matter affecting the estate or interest . . . covered by this Commitment other than those shown in Schedule B hereof**, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability . . . . If the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect . . . or other matter, the Company at its option may amend Schedule B of this Commitment[.][16]

This condition has two sentences, and the first clause of the first sentence is embolded for ease of reference below.

---

[15] CP at 6.

[16] *Id.* at 7 (emphasis added).

## IV

The key question is whether Transnation can rely on the second condition under the circumstances present here. Michak argues that Transnation could amend its preliminary commitment to reduce the width of the easement only if she had *actual* knowledge at closing that she would receive only a 30-foot easement.[17] She lacked such knowledge, she says, because no one told her about the supplemental; no one told her that the legal description she initialed at closing had been changed after issuance of the preliminary commitment; and she did not notice that it had been changed. Transnation responds that it is entitled to *impute* knowledge to Michak, because she initialed the changed legal description at closing, regardless of whether anyone told her about the supplemental; regardless of whether anyone told her at closing that the legal description had been changed; and regardless of whether she noticed that the legal description had been changed.[18]

This key question subdivides. (A) Was Transnation entitled to change its preliminary commitment only if its insured had "actual knowledge" of the change? (B) What did Transnation mean when it used the term "actual knowledge"? (C) Did Michak have (or lack) "actual knowledge" so clearly that reasonable minds could not differ?

---

[17] Michak states in her brief on appeal: "If Michak had been informed of the amendment she would have no choice, but to accept it. The failure to notify Michak of the change in legal description means that there has been no modification of the [preliminary] Commitment for Title Insurance." Br. of Appellant at 10.

[18] Transnation states in its brief on appeal:

The material facts here are simple, and are not in dispute:

- The Preliminary Commitment contained an error in the legal description.
- That error was corrected in a "Supplemental" issued before closing, and the correct legal description was initialed by Ms. Michak.
- All the closing documents contained the correct legal description, and all were properly signed by Ms. Michak.

There are no other facts at issue, material or otherwise.

Br. of Resp't at 3-4.

## A

Michak argues that Transnation could not change its preliminary commitment without telling her (i.e., unless she had "actual knowledge" of the change). Necessarily then, she is arguing that the first clause of the preliminary commitment's second condition, the clause embolded above, is intended to modify *both* of the condition's two sentences. If she is correct, the condition should be understood as follows:

> If the proposed insured has or acquires actual knowledge of any defect or other matter affecting the estate or interest covered by the Commitment other than those shown in Schedule B hereof, the Company shall be relieved from liability for any loss or damage; *but if* the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect or other matter, the Company at its option may amend Schedule B of this Commitment.

Or, alternatively, the condition should be understood as follows:

> If the proposed insured has or acquires actual knowledge of any defect or other matter affecting the estate or interest covered by the Commitment other than those shown in Schedule B hereof, the Company shall be relieved from liability for any loss or damage. *If the proposed insured has or acquires actual knowledge of any defect or other matter affecting the estate or interest covered by the Commitment other than those shown in Schedule B hereof,* [and] if the proposed insured shall disclose such knowledge to the Company or the Company otherwise acquires actual knowledge of any such defect or other matter, the Company at its option may amend Schedule B of this Commitment.

When Transnation argues that it could change its preliminary commitment without telling its insured, so long as it forwards the change to the escrow agent for initialing by the insured at closing, it may be arguing[19] that the first

---

[19] Transnation's brief fails to make clear whether Transnation is arguing (1) that actual knowledge is not required here; (2) that actual knowledge is required

clause of the preliminary commitment's second condition, the clause embolded above, is intended to modify *only the first* of the condition's two sentences. If that is correct, the condition should be understood as follows:

> If the proposed insured has or acquires actual knowledge of any defect or other matter affecting the estate or interest covered by the Commitment other than those shown in Schedule B hereof, the Company shall be relieved from liability for any loss or damage. *Regardless of whether the proposed insured has or acquires actual knowledge of any defect or other matter affecting the estate or interest covered by the Commitment other than those shown in Schedule B hereof,* if the proposed insured shall disclose knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect or other matter, the Company at its option may amend Schedule B of this Commitment.

 To determine the second condition's intended meaning, we should employ the usual rules of construction.

> "An insurance policy is construed as a whole, with the policy being given a 'fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance.' If the language is clear and unambiguous, the court must enforce it as written and may not modify it or create ambiguity where none exists. If the clause is ambiguous, however, extrinsic evidence of the intent of the parties may be relied upon to resolve the ambiguity. Any ambiguities remaining after examining applicable extrinsic evidence are resolved against the drafter-insurer and in favor of the insured. A clause is ambiguous when, on its face, it is fairly susceptible to two different interpretations, both of which are reasonable."[20]

but includes imputed knowledge; or both. Accordingly, this opinion will address both.

[20] *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 666, 15 P.3d 115 (2000) (quoting *Am. Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 134 Wn.2d 413, 427-28, 951 P.2d 250 (1998) (quoting *Key Tronic Corp. v. Aetna (CIGNA) Fire Underwriters Ins. Co.*, 124 Wn.2d 618, 627, 881 P.2d 201 (1994))); *see also Kitsap County v. Allstate Ins. Co.*, 136 Wn.2d 567, 575, 964 P.2d 1173 (1998); *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co. of Omaha*, 126 Wn.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994); *Sears v. Grange Ins. Ass'n*, 111 Wn.2d 636, 638, 762 P.2d 1141 (1988); *Shotwell v. Transamerica Title Ins. Co.*, 91 Wn.2d 161, 166-68, 588 P.2d 208 (1978) (title insurance case); *Munn v. Mut. of Enumclaw Ins.*

As highlighted by the parties' divergent views, the second condition lacks one plain meaning. That does not necessarily mean, however, that the second condition is ambiguous. As just seen, a policy provision is ambiguous only when "fairly susceptible to two different interpretations, *both of which are reasonable.*"[21]

 Michak's interpretation of Transnation's second condition is reasonable, for its effects include the following: (1) If the insured has actual knowledge of a defect before closing, but Transnation does not, Transnation is relieved from liability for the defect; (2) if both the insured and Transnation have actual knowledge of a defect before closing (regardless of whether Transnation obtained its knowledge from the insured or another source), Transnation may amend its preliminary commitment to exclude coverage for the defect; and (3) if Transnation has actual knowledge of a defect before closing, but its insured does not, Transnation may amend its preliminary commitment to exclude the defect—but only if Transnation informs its insured about the defect, thus creating actual knowledge in the insured. In each of these situations, the insured is left without insurance for the defect, but the insured is also furnished with the information that he or she needs to amend or rescind his or her contract with the seller.

Transnation's interpretation is not reasonable. Its first two effects would be the same as under Michak's interpretation. Its third effect, however, would be different: If Transnation had actual knowledge of a defect but its insured did not, Transnation could change its preliminary commitment to exclude the defect without informing the insured that the defect existed or that the coverage shown in the preliminary commitment was being narrowed. The results, of course, would be to strip the insured of coverage

---

Co., 73 Wn. App. 321, 324-25, 869 P.2d 99, *review denied*, 124 Wn.2d 1030 (1994); *State Farm Mut. Auto Ins. Co. v. Johnson*, 72 Wn. App. 580, 589, 871 P.2d 1066, *review denied*, 124 Wn.2d 1018 (1994).

[21] *Weyerhaeuser*, 142 Wn.2d at 666 (emphasis added).

without notice, and to leave the insured without the information that he or she needs to amend or rescind the contract with the seller. These results are not ones that a reputable title insurer would intend when it issues a preliminary commitment; not ones that the average purchaser or beneficiary of title insurance would understand when he or she purchases a title policy; and not ones that this court should sanction.

Besides being the only reasonable interpretation, Michak's interpretation is supported by several other rules of construction. It construes the condition as a whole, rather than isolating one sentence from the other; it construes the condition fairly and sensibly by forestalling a narrowing of coverage without notice; and it construes a poorly-worded condition against the party that drafted it. Transnation's second condition allowed it to change its preliminary commitment before closing, but only if Michak had actual knowledge of the defect underlying the change.

## B

The next question is whether Transnation intended that the term "actual knowledge" include "imputed knowledge." Conceptually, the two types of knowledge are fundamentally different. A person has actual knowledge of a fact when he or she is subjectively aware of its existence. A person has imputed knowledge, also called constructive knowledge, when the law charges him or her with knowledge of a fact, whether or not he or she is subjectively aware of the existence of that fact.[22] In the preliminary commit-

---

[22] *See Strand v. State*, 16 Wn.2d 107, 120, 132 P.2d 1011 (1943) ("it is not considered indispensable that the knowledge should be actual if the circumstances are such that a knowledge of the truth is necessarily imputed"); *Goodin v. Palace Store Co.*, 164 Wash. 625, 630, 4 P.2d 493 (1931) ("[i]f he did not have actual knowledge, the law will impute such knowledge to him"); *Ronald v. Schoenfeld*, 94 Wash. 238, 242, 162 P. 43 (1917) ("if he had no actual knowledge, the law will impute such knowledge to him"); *Mann v. Old Republic Nat'l Title Ins. Co.*, 975 S.W.2d 347, 352 (Tex. App. 1998) (Edelman, J., dissenting) ("Actual knowledge, *i.e.*, what a person actually knows, is generally that which is distinguished from constructive or imputed knowledge, i.e., what a person doesn't actually know but objectively should know or has reason to know."); *Connelly v. Kellogg*, 136 Conn.

ment at issue here, Transnation gave *no* indication that it intended the term "actual knowledge" to include imputed knowledge, or that it intended the term to have any meaning other than its ordinary one. And even if one were to assume that Transnation gave *some* indication, it succeeded at most in creating an ambiguity: "Actual knowledge" might or might not include imputed knowledge, and any ambiguity must be resolved in favor of the insured and against the insurer. For purposes of this case, the term "actual knowledge" does not include imputed knowledge, and whether Michak had imputed knowledge is wholly immaterial.

## C

The last question is whether Michak had actual knowledge so clearly that the trial court was warranted in granting summary judgment to Transnation. Transnation does not seem to claim that Michak had actual knowledge so clearly that reasonable minds could not differ. Michak claims, however, that she *lacked* actual knowledge so clearly reasonable minds could not differ, and that we should grant her cross-motion for summary judgment.

Transnation is correct on this point. Michak initialed the corrected legal description before closing was completed. Although she now claims not to have observed the correction, and thus to have lacked actual knowledge, a trier of fact could disbelieve her, infer that she perceived what she

---

33, 68 A.2d 170, 172 (1949) (if person who can read and write "signs or accepts a formal written contract . . . it is his duty to read it and notice of its contents will be imputed to him"; therefore, "the fact that [defendant] had no actual knowledge . . . cannot avail him"); 3 AM. JUR. 2D *Agency* § 281 (1986) (facts known to agent will be imputed to principal, and constitute "constructive notice," even if not "actually communicated" to principal; facts known to agent will not be imputed to principal when "determining whether [principal] acted in good faith since the principal's good faith must be determined on the basis of facts of which he had actual knowledge"). A couple of Washington cases mix terms but do not seem contrary to the general distinction. *Moise v. Hodges*, 156 Wash. 591, 602, 287 P. 878 (1930) ("the law will impute to appellants actual knowledge of the matter spoken of"); *Herzberg v. Moore*, 153 Wash. 641, 646, 280 P. 41 (1929) ("it is no excuse or defense . . . to say that he was ignorant . . . if the circumstances are such that the law will impute to him actual knowledge of the matter spoken of").

signed, and thus find that she acquired actual knowledge before the completion of closing. Conversely, a trier of fact could believe her, infer that she overlooked the change, and thus find that she lacked actual knowledge. It follows that whether Michak had actual knowledge is an issue requiring trial.

The dissent's discussion of imputed knowledge is immaterial.[23] Whether or not Michak had *imputed* knowledge, she can recover if she lacked *actual* knowledge.

The order granting summary judgment is reversed, and the case is remanded for further proceedings.

HUNT, J., concurs.

ARMSTRONG, C.J. (dissenting) — I respectfully dissent from the majority's decision that Transnation Title Insurance Company had a duty to inform Patricia Michak, before closing, of changes to the legal description of land she bought. Nothing in Transnation's preliminary commitment bound Transnation to notify Michak of newly discovered defects. Even if such a duty existed, I would hold that Michak acknowledged the correct legal description in the closing documents she signed. The majority concludes that signing the closing documents had no effect because the preliminary commitment required that Michak have actual notice of a defect before Transnation could amend the commitment. But the commitment does not contain such a requirement.

A person is bound by the contents of a contract that he signs voluntarily and knowingly. *Nat'l Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 912-13, 506 P.2d 20 (1973). Thus, a person who has had an opportunity to read a plain and unambiguous instrument " 'cannot claim to have been misled concerning its contents or to be ignorant of what is provided therein.' " *Equity Investors*, 81 Wn.2d at 913 (quoting *Johnston v. Spokane & Inland Empire R.R.*, 104

---

[23] So also is the dissent's reliance on *National Bank of Washington v. Equity Investors*, 81 Wn.2d 886, 910, 506 P.2d 20 (1973), a case that deals with imputed knowledge.

Wash. 562, 569, 177 P. 810 (1919)). Michak initialed the correct legal description without reading it and then claimed that Transnation breached a duty to notify her that the description had changed. But, under *Equity Investors*, Michak cannot claim she did not know that the legal description included only a 30-foot easement.

The majority concludes that Michak can claim she did not know the true width of the easement despite the accurate description in the closing documents she signed. According to the majority, the only reasonable interpretation of the preliminary commitment requires that, before Transnation could amend the commitment to add defect, the insured had to have actual knowledge of the defect. But this interpretation is unsupported by the language of the preliminary commitment.

The commitment first relieves Transnation of liability for loss incurred because of a defect of which the insured has actual knowledge but fails to disclose to Transnation:

> If the proposed insured has or acquires actual knowledge of any defect . . . or other matter affecting the estate or interes . . . covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability[.]

Clerk's Papers (CP) at 7. This language binds the insured to notify Transnation; the duty is not reciprocal. The commitment goes on to allow Transnation to amend Schedule B of the commitment to add defects as it discovers them:

> If the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect . . . the Company at its option may amend Schedule B of this Commitment[.]

CP at 7. Thus, Transnation could choose to amend the commitment if (1) the insured had actual knowledge of a defect and disclosed the defect to Transnation *or* (2) Transnation learned of a defect from any other source. Stated simply, Transnation could amend Schedule B re-

gardless of how it learned of a defect and regardless of whether the insured already knew of the defect.

Despite the majority's meticulous analysis, nothing in the language or structure of these two sentences indicates that amending the commitment to add a defect required the insured's actual knowledge of the defect. The majority reasons that the phrase "[i]f the proposed insured has or acquires actual knowledge of any defect" applies to both sentences. But this reading mischaracterizes the text.

The majority concludes that its reading of the contract is reasonable because public policy reasons support the result. But the majority modifies the contract language to reach its result. And a court "may not modify clear and unambiguous language in an insurance contract." *Tucker v. Bankers Life & Cas. Co.*, 67 Wn.2d 60, 66, 406 P.2d 628 (1965). Further, under the majority's interpretation, Transnation could not even have met the actual knowledge requirement by sending Michak a copy of the supplemental commitment, which contained the revised legal description. Transnation would have had to tell Michak about the defect *before* making the revision and sending the supplement.

I would uphold the summary judgment in favor of Transnation. Thus, I dissent.

Review granted at 145 Wn.2d 1033 (2002).