[No. 27704. Department One. January 18, 1940.]

HORTON R. ANDREWS *et al., Respondents,* v. STANDARD LUMBER COMPANY, *Appellant.*[1]

[1]Reported in 97 P. (2d) 1062.

*E. D. Weller*, for appellant.

*Hamblen, Gilbert & Brooke*, for respondents.

SIMPSON, J.—Plaintiffs instituted this action to recover an amount of money they were compelled to pay over and above the contract price of a dwelling house.

Plaintiffs alleged that they were induced by false representations of defendant to enter into a contract to build a home for themselves at a cost of $3,700; that defendant described to plaintiffs a so-called Pabco construction plan under which plaintiffs' home could be built, and represented to plaintiffs that, under that plan, which would be employed in connection therewith, defendant would control and supervise the construction of the home. It was further alleged that defendant represented that the plan had been employed by it in the construction of numerous other houses; that the plan was equal to a completion bond; and that, by use of the Pabco construction plan, plaintiffs would obtain the guarantee of defendant that their proposed house would be fully completed at a cost of $3,700, free and clear of all liens. It was alleged that defendant made the representations falsely for the purpose of promoting the sale of building supplies which defendant had for sale.

Defendant interposed a demurrer upon the ground that the facts pleaded were not sufficient to constitute a cause of action. The demurrer was overruled. In its answer, defendant denied the allegations contained in the complaint.

The case was tried to a jury. At the close of plaintiffs' case, defendant challenged the sufficiency of the proof and moved for a judgment of nonsuit. The motion was denied, and defendant did not submit further evidence. The jury returned a verdict for plaintiffs, and the court entered judgment thereon. Defendant appeals and urges error on the part of the trial court in overruling defendant's demurrer to the complaint and in denying the challenge to the sufficiency of plaintiffs' evidence.

The facts are these: In the early part of 1937, respondents noticed advertisements of defendant to the effect that it was operating under the Pabco protected finance plan in the construction of homes. As they desired to build a home, respondents called at appellant's office to inquire about the advertised plan. They there submitted to R. S. Brown, manager of the company's home building department, a sketch of the house plan and sought information concerning the building plan advertised by defendant.

Relative to the plan of operation outlined by Mr. Brown, plaintiff Horton R. Andrews testified:

"Well, under the plan they were operating, they would draw up a blue-printed plan of the house and show the various elevations of the outside of the house, and then take off a specification and material list, the specific list which would necessarily have to be submitted to the Federal Housing Administration for their approval so that they would know whether or not they would advance the loan on the construction of the house. . . . he said that this Pabco plan was a protected finance plan which assured me that I was

going to get a completed house without any liens or any encumbrances against the house when it was completed."

The method of procedure outlined by appellant was upon a form named Pabco control plan. The record provided for the property description, the name of the building contractor, the amount of the contract price, and a breakdown of the cost of various construction items which went into the completed building.

Plaintiff testified further concerning the representations made about the chart as follows:

"Well, he brought out this control chart—I don't recall the party's name that they were using this control record on, but it was one of the houses that was being constructed, and he showed me this plan and told me that that was the method which they used to protect and guarantee their customer a completed job, and showed me each individual operation of the house, such as the construction of the foundation and how, when the basement was excavated, that a certain amount of money would be paid, and on completion of the excavation that the balance would be paid only upon a release or signed slip by the party doing this work that they had no further hold or no liens would be filed against the property. And he explained in detail how these various operations worked and how it would guarantee that by using this plan that it would give me the completed job without any encumbrance against the house."

With relation to the representations made to him by Mr. Brown, plaintiff stated:

"When the money was made available, the construction control plan was to be used in this respect: that as the work was completed in certain stages, a certain amount of money would be paid to each contractor or sub-contractor in building this house, and that this money would be disbursed only after certain portions of the work was completed. . . . the statement was made that it was a guaranty that the house would be

completed and it was known as what they called a turnkey job. . . . In other words, he guaranteed that by the use of this plan that it would complete the house without any lien or any encumbrance against the house and the house would be turned over to us completed for the amount of money of the loan. Q. Did you later have other conversations with Mr. Brown? A. Yes. . . . I was persuaded to go ahead with this plan because this protected finance plan was a guaranty to me to disburse my money without any liens, and that each material jobber or laborer would be paid by them on a little form which they had, which assured me that there would be no liens filed against the house. . . . Well, then came the question of getting some one to build the house, and Mr. Brown told me that I would be privileged to go on the outside of their company and secure some one to build the house and ask for bids, but that he suggested that I use as a contractor a Mr. Wilson, who had been building quite a few houses for them, and if I remember correctly, my remarks were, if this man was capable of building a good house, that I could see no reason why I could not use Mr. Wilson rather than go outside and secure outside bids."

He further testified: "It would be a guaranty that it would be completed for that amount of money."

After the conversation with Brown, a house plan was drawn by an architect in appellant's office, and respondents entered into a building contract with H. L. Wilson, the contractor recommended by appellant.

The contract was as follows:

"This agreement made the 2nd day of July, 1937, by and between H. L. Wilson, hereinafter called the CONTRACTOR, and Horton R. Andrews, hereinafter called the OWNER:

"Witnesseth: That the Contractor and the owner, for the consideration hereinafter named, agree as follows:

"(1) The Contractor shall furnish all of the materials and perform all of the work shown on the draw-

ings and described in the specifications entitled 'Home of Mr. & Mrs. Horton R. Andrews at 432 28th Avenue, Spokane, Washington.'

"(2) The work to be performed under this agreement shall be commenced after the loan has been committed by the Occidental Life Insurance Company and order signed by the Owner authorizing the Spokane Title Company, who is the agent of the mortgagee, to pay construction costs through the Standard Lumber Company who acts as 'Payee' for the Owner and a 'Trustee' for the mortgagee, weather conditions permitting.

"(3) The Owner shall pay the Contractor for the performance of the contract, the lump sum of Thirty Seven Hundred Dollars ($3700) for which amount the Contractor agrees to complete the house.

"(4) It is agreed that the cash deposit of Three Hundred Dollars and the amount of the loan Thirty four hundred dollars ($3400) shall be disbursed by the Standard Lumber Company in payment of labor and materials in accordance with the provisions of the 'Pabco Construction Control Record' which has been prepared for construction of said house.

"IN WITNESS WHEREOF the parties hereto have executed this agreement the day and year first above written.

WITNESS:

......................................................................  Horton R. Andrews
                                         (Owner)
......................................................................  H. L. Wilson
                                         (Contractor)
STANDARD LUMBER COMPANY   R. S. Brown"

After the building had been completed by the contractor, it was found that the $3,700 provided for in the contract was not sufficient to pay all of the necessary accounts, and that liens were filed against the property which respondents were compelled to pay. The total amount and validity of the liens are not in dispute.

We will consider only the second assignment of

error, that relating to the sufficiency of the evidence introduced by respondents.

■ The first question presented is whether the evidence established facts showing the commission of fraud.

In *Webster v. Romano Engineering Corp.*, 178 Wash. 118, 34 P. (2d) 428, we set out the essential elements of fraud in the following language:

"But what is fraud? This court has been reluctant to circumscribe it by definition. *Knutsen v. Alitak Fish Co.*, 176 Wash. 169, 28 P. (2d) 334; *American Savings Bank & Trust Co. v. Bremerton Gas Co.*, 99 Wash. 18, 168 Pac. 775. We have, however, along with all other courts, recognized certain essential elements that enter into its composition. These are: (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage. 26 C. J., p. 1062, §§ 6 and 7; *Grant v. Huschke*, 74 Wash. 257, 133 Pac. 447; *Raser v. Moomaw*, 78 Wash. 653, 139 Pac. 622, 51 L. R. A. (N. S.) 707; *Hamilton v. Mihills*, 92 Wash. 675, 159 Pac. 887."

It is quite obvious that the representations did not relate to an existing fact, but only to the results that would obtain by the use of the Pabco plan, that is, that the cost of the building would not exceed $3,700. Appellant did not sell the Pabco plan or anything else to respondents. All it did was to extoll, through its agent, the virtues of the plan and explain how, by following its provisions, respondents would get a completed house without any liens or encumbrances against it.

In support of their view that the representations

had reference to existing facts, respondents rely upon *Horowitz v. Kuehl,* 117 Wash. 16, 200 Pac. 570, and upon *Weller v. Advance-Rumely Thresher Co.,* 160 Wash. 510, 295 Pac. 482. Careful examination of these cases convinces us that they do not avail respondents in establishing this element of fraud under the facts which obtain in the case at bar.

In *Forsyth v. Davis,* 152 Wash. 595, 278 Pac. 676, we made these observations:

"That testimony must be 'clear, cogent and convincing,' in order to support a judgment as for fraudulent misrepresentations, is well settled. It is also true, as was stated by this court in *Wilson v. Mills,* 91 Wash. 71, 157 Pac. 467, a case based upon alleged fraudulent misrepresentations, that '. . . every case of this character must rest upon its own facts, subject to certain general principles.' This being true, it is seldom that opinions in cases previously decided are of more than general assistance in determining whether or not the facts in a particular case do or do not support a judgment for damages based upon alleged fraudulent misrepresentations."

We find this language appropriate here, and conclude that, in the instant case, the statements imputed to appellant's agent related to future events and were not so commingled with existing facts as to make them actionable.

Careful examination of the record fails to disclose that respondents introduced any direct evidence tending to prove that appellant's agent had knowledge of the falsity, or was ignorant of the truth, of the representations attributed to him in regard to the Pabco plan. There was no evidence which even tended to show that the plan had not proven effective when followed by other builders.

The record discloses that respondents relied upon the representations relating to appellant's oral

guaranty to the effect that there would be no outstanding liens or encumbrances upon completion of the house.

On cross-examination of Mr. Andrews, the following transpired:

"Q. You understood, Mr. Andrews, from that that it was the guaranty of the Standard Lumber Company, did you not? A. Yes, that is who I was doing business with. Q. That the job would be completed with all bills paid? A. That is right. Q. And that if there were any bills remaining unpaid after the $3700 was exhausted, that the Standard Lumber Company would pay them? A. That wasn't even taken as part of the conversation. No, there was no question as to whether there would be any unpaid bills. It would be a guaranty that it would be completed for that amount of money. Q. That is what the guaranty meant, wasn't it, Mr. Andrews, that if there were any, that they would pay them? A. Yes. However, that part was never discussed, whether there would be any unpaid bills. It was just assumed by both sides that it would be completed for that amount of money. Q. And that was your understanding, that if there were any unpaid bills, that the Standard Lumber Company would take care of them? A. Yes, sir. Q. That was what the guaranty was supposed to be? A. That is right. Q. Then, you say that you don't recall that the wording was used as alleged in your complaint that it was the equivalent to a completion bond? You wouldn't say that that was used? A. Yes, I was assuming that it was but I don't believe that he used the words to me that it was a completion bond. Q. But the understanding as you gathered was that the Standard Lumber Company was guaranteeing the completion of that house for $3700 with all bills paid? A. That is right."

In their final analysis, the statements attributed to appellant's agent amounted simply to an agreement that the Pabco plan would result in a completed building guaranteed by appellant not to exceed the cost of

$3,700. Appellant cannot be charged with fraud simply because that amount was exceeded.

Appellant urges, among other things, that, as the statements ascribed to Mr. Brown were oral promises to answer for the debt, default, or misdoings of another, their enforcement is prohibited by our statute of frauds, Rem. Rev. Stat., § 5825 [P. C. § 7745].

Respondents contend, however, that the statute of frauds does not apply to a promise made for the purpose of securing a benefit or consideration to the promisor, and cite in support thereof *Burns v. Bradford-Kennedy Lumber Co.*, 61 Wash. 276, 112 Pac. 359; *Guth v. First Nat. Bank,* 137 Wash. 280, 242 Pac. 42.

We are in agreement with the principle of the law asserted by respondents, but fail to see its application to the facts presented in this case. In each of the cases, the promisor either was to, or did, receive a benefit from the result obtained. In the instant case, the appellant did not receive, in so far as the evidence discloses, any profit from the contract into which the respondents and the builder, H. L. Wilson, subsequently entered.

It is quite likely that appellant did sell to the contractor some of the building supplies it had for sale, but no evidence was produced tending to show that such was a fact. Moreover, the builder was an independent contractor and could purchase the materials used in the dwelling from any person with whom he desired to do business. We cannot assume, in the absence of evidence, that appellant received any profit or benefit from the contract entered into between Wilson and respondents.

We hold that the statements made by the agent of appellant corporation were promises to guarantee the default of the contractor. Not being in writing, they are not actionable.

We conclude that evidence introduced was not sufficent to justify submission of the case to the jury, and, for that reason, we reverse the judgment.

BLAKE, C. J., MAIN, MILLARD, and ROBINSON, JJ., concur.

[1]Reported in 97 P. (2d) 1070.