522 F.2d 588
 Henry HILTON, Plaintiff-Appellant,
v.
Richard Henry MUMAW and Bethel Mumaw, his wife and the
marital community composed thereof, Defendants-Appellees.
Anthony HILTON, Plaintiff-Appellant,
v.
Richard Henry MUMAW and Bethel Mumaw, his wife and the
marital community composed thereof, Defendants-Appellees.
Anthony HILTON, Plaintiff-Appellee,
v.
Richard Henry MUMAW and Bethel Mumaw, his wife and the
marital community composed thereof, Defendants-Appellants.
Anthony HILTON, Plaintiff-Appellee,
v.
Richard Henry MUMAW and Bethel Mumaw, his wife and the
marital community composed thereof, Defendants-Appellants.
 Nos. 73-1077, 73-1131.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 4, 1975.
 
 John T. Piper (argued), Seattle, Wash., for plaintiff-appellant.
 Stanley J. Krause (argued), Aberdeen, Wash., for defendants-appellees.
 Before DUNIWAY, INGRAHAM* and WALLACE, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Anthony Hilton and Henry Hilton (Hiltons) brought this action against Henry and Bethel Mumaw (Mumaws),[1] alleging claims of common law and equitable fraud and violations of Rev.Code Wash. § 21.20.010 and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The alleged fraud was perpetrated in connection with contracts for the purchase of stock of Cohassett Beach Telephone Co. (Cohassett). Jurisdiction in the district court was founded upon diversity of citizenship.
 
 
 2
 After the Hiltons presented their case-in-chief, the Mumaws moved for directed verdict. The district court granted the motion, specifying two reasons: first, the Hiltons had presented insufficient evidence on each of their theories of recovery; and second, their claims were barred by the statute of limitations. Hiltons appealed from the directed verdict and Mumaws then cross-appealed from the earlier denial of their motion for summary judgment. We affirm in part and reverse in part the directed verdict. We affirm in part the denial of summary judgment and we dismiss in part the cross-appeal.
 
 I. The Appeal
 A. Background
 
 3
 The facts, taken in a light most favorable to Hiltons, show that they are grandsons and joint one-third heirs of W. C. Mumaw, who died in 1969. Mumaws are husband and wife. Henry Mumaw is the son of W. C. Mumaw and an uncle of the Hiltons. He is also an heir of W. C. Mumaw and the executor of his estate. Hiltons allege that Mumaws defrauded W. C. Mumaw in contracting in 1957, 1958 and 1959 to buy all his stock in Cohassett. They seek damages in the amount of their share of the losses suffered by W. C. Mumaw and an accounting, imposition of a constructive trust and an order requiring conveyance to them of their share of the proceeds from the sale of such stock by Mumaws. Thus, Hiltons bring this action solely as joint one-third heirs of whatever claims W. C. Mumaw might have possessed against Mumaws.
 
 
 4
 W. C. Mumaw co-founded Cohassett in 1911. He bought out his associate in 1941 and managed the company by himself until 1949. Mumaws' active involvement in the business began in 1946, when they both worked part-time for Cohassett. In 1949, Henry Mumaw became a full-time employee and by 1952, he had become manager of the company, replacing W. C. Mumaw. Also in that year, Bethel Mumaw took over bookkeeping relevant to loans from the Rural Electrification Administration (REA), which were to prove crucial to Cohassett's growth. By 1955, she had taken over all company bookkeeping from W. C. Mumaw.
 
 
 5
 Cohassett undertook a major expansion program approximately the same time that Mumaws entered management. As late as 1946, the company served only 150 subscribers. In 1952, it began to expand and improve its services, relying upon REA loans payable over 35 years at 2% Interest. Between 1952 and 1957, Cohassett's operating revenues more than doubled, and by 1964, they had increased fivefold. Mumaws were almost entirely responsible for obtaining REA financing and overseeing Cohassett's growth. During this same period, for reasons that we need not detail, small telephone companies like Cohassett became very attractive investments for telephone holding companies. During the trial, expert testimony placed the value of Cohassett in 1957, when the first of the disputed contracts were signed, at $300,000.
 
 
 6
 When the 1957 contract was signed, Henry Mumaw was a director and president of Cohassett; W. C. Mumaw was a director and secretary; and his wife, Myrtle Mumaw, was the remaining director and vice-president. Together with his wife, W. C. Mumaw owned 190 of the 200 outstanding shares of Cohassett. Henry Mumaw owned 10 shares.
 
 
 7
 The contracts giving rise to this action were signed by Mumaws and W. C. Mumaw in 1957, 1958 and 1959. The 1957 contract is the most important. It provides for the sale to Mumaws of all Cohassett stock held by W. C. Mumaw and his wife. The purchase price was.$19,000, payable over 32 years at $50 per month without interest. Discounted at 6%, the value of the promise to pay was slightly less than $8,500 in 1957. Title passed as the payments were made and Mumaws received voting control upon W. C. Mumaw's death. Mumaws could accelerate payments with W. C. Mumaw's written consent.
 
 
 8
 The 1958 contract contained W. C. Mumaw's written consent to accelerate payments.
 
 
 9
 The 1959 contract was the second half of a two-part transaction. In the first half, W. C. Mumaw surrendered $8,000 of notes payable by Cohassett in 1962 and accruing interest at 6%. In exchange, Cohassett issued to him 80 shares of stock. With the 1959 contract, W. C. Mumaw sold his 80 shares of stock to Mumaws for an $8,000 note payable by Mumaws and accruing interest at 6%, but only after the 1957 contract had been paid off, or as much as 29 years later. Assuming that payments were not begun until that time, the value of the obligation discounted at 6% Was $940 at the time the contract was made.
 
 
 10
 Mumaws paid installments under the 1957 contract at $50 per month until 1963. They sharply increased their payments in the years 1963 to 1966, and in 1967, bought the remaining 60% Interest of W. C. Mumaw for $16,150. They then sold all their Cohassett stock to Continental Telephone Corp., receiving $1,236,000 and realizing a profit in excess of $1,200,000. Hiltons learned of the price Mumaws had obtained from Continental Telephone Corp. in December, 1970. They brought this action four months later.
 
 
 11
 W. C. Mumaw died in 1969, after entering a rest home in 1963 when he could no longer care for himself. Probate of his estate was completed in February, 1970.
 
 B. Effect of Probate Proceedings
 
 12
 Mumaws argue that state probate proceedings bar this action on three grounds: first, federal courts lack jurisdiction to "restore" corpus to the estate of a decedent; second, the 1970 decree closing W. C. Mumaw's estate and the 1958 decree closing the estate of his wife bar this action by res judicata; and third, the one-year limitation applicable to certain actions by heirs against administrators bars this action. We reject each of these arguments.
 
 1. Lack of Federal Jurisdiction
 
 13
 Mumaws' jurisdiction argument is governed by Markham v. Allen, 326 U.S. 490, 66 S.Ct. 296 at 298, 90 L.Ed. 256 (1946):
 
 
 14
 (F)ederal courts of equity have jurisdiction to entertain suits "in favor of creditors, legatees and heirs" and other claimants against a decedent's estate "to establish their claims" so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court.
 
 
 15
 Id. at 494 (citations omitted). The evil to be avoided is federal interference with state probate proceedings. See H. Hart & H. Wechsler, The Federal Courts and the Federal System 1186-87 (2d ed. 1973). The present action poses no such threat.[2]
 
 
 16
 The probate of W. C. Mumaw's estate was completed and Hilton's joint one-third share fixed before this action was filed. Hiltons concede that they are entitled to relief only to the extent of their rights under the probate decree closing W. C. Mumaw's estate. The only question to be decided is whether recovery may be had upon claims that, in the first instance, are those of the estate. Federal adjudication of this question interferes with state probate proceedings no more than federal adjudication of claims against the estate, an exercise of federal jurisdiction that is clearly proper.
 
 
 17
 We are aware of no likely conflict between state and federal proceedings and Mumaws have brought none to our attention. Should Hiltons succeed in this action, and reopening of an estate become necessary, See In re Estate of Christianson, 16 Wash.2d 48, 53, 132 P.2d 368, 371 (1942) (dictum), the district court should restrict its relief to avoid interference with pending or imminent probate proceedings.
 
 
 18
 Divorced from any basis in policy, Mumaws' argument reduces to the assertion that federal courts lack power in all circumstances to determine claims to "restore" an estate, either asserted directly by an executor or indirectly by an heir. They cite two decisions to support this broad rule: Princess Lida v. Thompson, 305 U.S. 456, 59 S.Ct. 275, 83 L.Ed. 285 (1939), and Smith v. Smith, 272 F.Supp. 397 (W.D.Va.1967). The first is not in point. Princess Lida holds only that federal courts lack jurisdiction to supervise the administration of an Inter vivos trust. It restricts federal jurisdiction over "restoration" of trust assets only to the extent that restoration of assets serves as a remedy against trustees engaged in mismanagement. 305 U.S. at 462-68, 59 S.Ct. 275, 83 L.Ed. 285. This holding is an obvious corollary to the principle that federal courts lack jurisdiction to supervise trust administration. The second decision is also distinguishable. In Smith v. Smith, an heir brought an action for an accounting against the executor of an estate in federal court after filing an action for similar relief in state court. 272 F.Supp. at 398-99. The risk of inconsistent adjudications and inconsistent remedies was apparent and great. Furthermore, the federal plaintiff had created this risk herself. Although the opinion contains dicta that support Mumaws' position, 272 F.Supp. at 399-400, we decline to follow such statements where no risk of interference with state probate proceedings is present.
 
 2. Res Judicata
 
 19
 Mumaws' second argument is that the probate decree closing W. C. Mumaw's estate, and the earlier decree closing his wife's estate, bar this action by res judicata. Neither proceeding expressly determined the claims asserted in this action. Mumaws argue, however, that Hiltons or the executors of the estates should have raised these claims. We cannot agree.
 
 
 20
 Under the law of Washington the state in which both estates were probated and the forum of this action a probate decree is final neither as to assets of the estate fraudulently withheld from administration nor as to claims that the complaining parties could not have asserted in the exercise of reasonable diligence. Farley v. Davis, 10 Wash.2d 62, 71-72, 116 P.2d 263, 268 (1941); Golden v. McGill, 3 Wash.2d 708, 720-21, 724-25, 102 P.2d 219, 224, 225 (1940); Rosenberg v. Rosenberg, 141 Wash. 86, 91-92, 250 P. 947, 949 (1926); See In re Estate of Dyer, 161 Wash. 498, 500-02, 297 P. 196, 197-98 (1931). As will subsequently appear, See section I.C.1. Infra, it may be reasonably inferred that W. C. Mumaw never had notice of the alleged fraud underlying the 1957 and 1958 contracts[3] and that Hiltons did not possess such notice until December, 1970, four months before this action was brought. Since W. C. Mumaw was the executor of his wife's estate, the same evidence eliminates any ground for a directed verdict on the basis of the probate decree closing that estate. The only other person who could have raised Hiltons' claims in probate proceedings was W. C. Mumaw's executor. But since Henry Mumaw filled this office, Hiltons can hardly be bound by his inaction. See In re Estate of Dyer, supra, 161 Wash. at 501, 297 P. at 197-98; Rosenberg v. Rosenberg, supra, 141 Wash. at 92, 250 P. at 949.
 
 3. Statute of Limitations
 
 21
 For the reasons set forth in the preceding section, the claims with respect to the 1957 and 1958 contracts[4] are not barred by the following one-year limitation:
 
 
 22
 An action by an heir, legatee, creditor or other party interested, against an executor or administrator, for alleged misfeasance, malfeasance or mismanagement of the estate within one year from the time of final settlement, or, the time such alleged misconduct was discovered.
 
 
 23
 Rev.Code Wash. § 4.16.110(2). Assuming the statute to be otherwise applicable a question we do not reach Mumaws fall within the statutory language that tolls the limitation until "such alleged misconduct was discovered."[5]
 
 
 24
 C. State Common Law and Equitable Fraud Claims
 
 
 25
 Washington law governs Hiltons' state law claims since this action was brought in Washington and the acts and occurrences giving rise to Hiltons' claims all took place in Washington. Klaxon Co. v. Stentor Elec. Mfg. Co.,313 U.S. 487 (1941).
 
 
 26
 As this case comes to us on appeal, the allegedly fraudulent acts and omissions have narrowed to four: first, misrepresentations that Cohassett stock had no market value; second, failure to disclose correspondence inquiring about the sale of Cohassett; third, misrepresentations by Mumaws that they were reluctant to buy W. C. Mumaw's stock; and fourth, exerting undue influence. The first and second of these are the most important. The alleged misrepresentations that Cohassett stock had no market value resulted from unsuccessful efforts to sell a minority interest in Cohassett over the years 1953 to 1956. Hiltons assert that Mumaws convinced W. C. Mumaw that his majority interest possessed no market value because a minority interest could not be sold. The alleged nondisclosure is related. It concerns Mumaws' failure to disclose routine letters inquiring about the purchase of Cohassett and one series of correspondence that followed up on one such inquiry.
 
 
 27
 Since we conclude that Hiltons have presented insufficient evidence as to the third and fourth allegedly fraudulent acts, we do not discuss the statute of limitations applicable to these claims. See sections I.C.2.b., c. Infra. Further, Hiltons claim only undue influence with respect to the 1959 contract and we discuss that contract only in the section dealing with undue influence. See section I.C.2.c. Infra.
 
 1. Statute of Limitations
 
 28
 Hiltons' common law and equitable fraud claims are governed by a three-year limitation for actions of the following type:
 
 
 29
 An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud . . . .
 
 
 30
 Rev.Code Wash. § 4.16.080(4).[6] This limitation applies to equitable as well as legal actions for fraud. Arneman v. Arneman, 43 Wash.2d 787, 797, 799-800, 264 P.2d 256, 262, 263-64 (1953) (alternate holding). Actual knowledge of the fraud is not necessary to start the limitation running:
 
 
 31
 The statute begins to run when the fraud should have been discovered, and a clue to the fact which, if followed up diligently, would lead to discovery, is in law equivalent to discovery.
 
 
 32
 Bay City Lumber Co. v. Anderson, 8 Wash.2d 191, 211, 111 P.2d 771, 779 (1941) (quoting earlier decisions) (alternate holding); Accord, Strong v. Clark, 56 Wash.2d 230, 232, 352 P.2d 183, 184 (1960); In re Estate of Sackman, 34 Wash.2d 864, 869, 210 P.2d 682, 684-85 (1949). The question when the limitation begins to run is for the finder of fact. See Imus v. Reeder, 119 Wash. 699, 699-700, 205 P. 380 (1922) (dictum).
 
 
 33
 Hiltons argue that W. C. Mumaw lacked notice of the fraud underlying the 1957 and 1958 contracts because he could reasonably rely upon his fiduciary relationship with Mumaws. This argument is not so doubtful that it may be taken from the jury. Although the existence of a fiduciary relationship does not relieve Hiltons of the burden of proving that W. C. Mumaw did not know of the fraud and could not with diligence have discovered it, Bay City Lumber Co. v. Anderson, supra, 8 Wash.2d at 209, 111 P.2d at 779; Reeves v. John Davis & Co., 164 Wash. 287, 291-95, 2 P.2d 732, 734-35 (1931),[7] the Washington courts have relied upon the fiduciary obligation owed to a plaintiff in determining whether he exercised diligence, Ackerson v. Elliott, 97 Wash. 31, 39-40, 165 P. 899, 903 (1917) (en banc); See Viewcrest Cooperative Ass'n v. Deer, 70 Wash.2d 290, 292-95, 422 P.2d 832, 834-35 (1967); Arneman v. Arneman, supra, 43 Wash.2d at 799-800, 264 P.2d at 263-64 (alternate holding).
 
 
 34
 The evidence is undisputed that in 1952, Henry Mumaw became manager of Cohassett, and that in 1955, Bethel Mumaw took over all company bookkeeping. Upon direct examination by Hiltons' counsel, and after an earlier request to summarize Cohassett's business correspondence, Henry Mumaw could produce only one letter written by W. C. Mumaw after 1952 that was even marginally related to company business. Drawing all reasonable inferences favorable to Hiltons, we conclude that W. C. Mumaw relinquished any significant role in management in 1955 and that he was thereafter dependent upon Mumaws for information concerning the operation and financial condition of the company. See Arneman v. Arneman, supra, 43 Wash.2d at 800, 264 P.2d at 264 (alternate holding).
 
 
 35
 So construing the evidence, the jury could reasonably find facts giving rise to a fiduciary obligation on the part of Mumaws as officers and directors in their dealings with W. C. Mumaw as a shareholder. State ex rel. Hayes Oyster Co. v. Keypoint Oyster Co., 64 Wash.2d 375, 381, 391 P.2d 979, 983 (1964) (dictum); Shermer v. Baker, 2 Wash.App. 845, 853, 472 P.2d 589, 594-95 (2d Div.) Review denied, 78 Wash.2d 994 (1970) (alternate holding). W. C. Mumaw's position as a corporate officer and director would not relieve them of this duty, Voellmeck v. Harding, 166 Wash. 93, 99-103, 6 P.2d 373, 375-76 (1931), especially since corporate positions in a closely held family corporation may lack practical significance, See Arneman v. Arneman, supra, 43 Wash.2d at 799-800, 264 P.2d at 263-64. Furthermore, the family relationship between Mumaws and W. C. Mumaw strengthens the basis for a fiduciary obligation. See id.; Myer v. Campion, 120 Wash. 457, 467-68, 207 P. 670, 673-74 (1922). Indeed, this factor is crucial.
 
 
 36
 W. C. Mumaw managed Cohassett for over 40 years. In 1954, he had valued Cohassett at slightly less than $52,000. In 1951, he had predicted that Cohassett would eventually grow to 1000 customers and in 1956, he signed an application to the Washington Public Service Commission also predicting growth to 1000 customers (from the then-current 500) and containing basic financial information. A man who had spent most of his life developing a business would not forget its value or expected growth. Finally, from 1953 to 1957, W. C. Mumaw served as a director of the Washington Independent Telephone Association, although whether that position involved only promotional work is a matter of dispute.
 
 
 37
 Two facts lead us to a reasonable inference that W. C. Mumaw could have believed that Cohassett stock possessed no market value and still have acted diligently. First, Henry Mumaw testified at trial that W. C. Mumaw believed his stock possessed no market value. Second, a diligent man may question the statements of others where he would not question the statements of his son, especially where, as here, he has entrusted him with his business. Indeed, W. C. Mumaw once contemplated having his son manage the investment of his personal savings and when he entered a nursing home in 1963, he gave him his power of attorney. Although a fiduciary obligation between Mumaws and W. C. Mumaw would not relieve him of all duty to inquire regardless of his knowledge, whether the facts known to him were sufficient to dispel the reasonable trust he could place in Mumaws is a question for the jury. It cannot be answered without resolving important questions of disputed fact, for instance, the knowledge possessed by W. C. Mumaw in 1957 and thereafter, the degree of his dependence upon Mumaws for financial information and advice, and the other sources from which he could determine the value of his stock. Although this list of factors is not exclusive, it illustrates the detailed factual inquiry necessary to determine whether W. C. Mumaw did know of the alleged fraud or could have discovered it with the exercise of diligence.
 
 2. The Merits
 
 38
 a. Misrepresentations as to market value and failure to disclose purchase inquiries
 
 
 39
 The Washington courts recognize the traditional action for common law fraud, defining it as follows:
 
 
 40
 (1) A representation of an existing fact; (2) its materiality; (3) its falsity; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person to whom it is made; (6) ignorance of its falsity on the part of the person to whom it is made; (7) the latter's reliance on the truth of the representation; (8) his right to rely upon it; (9) his consequent damage.
 
 
 41
 Salter v. Heiser, 36 Wash.2d 536, 549, 219 P.2d 574, 581 (1950) (quoting prior decisions); Accord, Oates v. Taylor, 31 Wash.2d 898, 902, 199 P.2d 924, 927 (1948); Andrews v. Standard Lumber Co., 2 Wash.2d 294, 300, 97 P.2d 1062, 1065 (1940). The Washington courts also follow the usual rule requiring proof of fraud by "clear, cogent and convincing" evidence. Viewcrest Cooperative Ass'n v. Deer, supra, 70 Wash.2d at 294, 422 P.2d at 835; Andrews v. Standard Lumber Co., supra, 2 Wash.2d at 301, 97 P.2d at 1065. Accordingly, the question before us is whether Hiltons have presented evidence which, together with all reasonable inferences, provides "clear, cogent and convincing" proof of each of the elements of common law fraud. We hold that they have.
 
 
 42
 Only the first of these elements requires detailed discussion. Henry Mumaw testified that he had discussed the lack of market value of Cohassett stock with W. C. Mumaw in 1953 to 1956. He also testified that in 1957, W. C. Mumaw "knew" that the stock had no market value and that he and his wife were reluctant to buy the stock for that reason. Bethel Mumaw testified to the same effect. This evidence gives rise to a reasonable inference that Mumaws represented in negotiations preceding the 1957 contract that Cohassett stock had no market value.
 
 
 43
 Mumaws might also be found liable for nondisclosure. For the reasons stated in section I.C.1. Supra, the jury could reasonably find facts giving rise to a fiduciary relationship. Where a fiduciary relationship exists, nondisclosure may be equivalent to affirmative misstatement. Oates v. Taylor, supra, 31 Wash.2d at 902-04, 199 P.2d at 927-28 (dictum); Goodin v. Palace Store Co., 164 Wash. 625, 630-31, 4 P.2d 493, 495 (1931). Hence Mumaws could be found liable for failing to disclose correspondence inquiring about the purchase of Cohassett. The evidence permits a reasonable inference of such nondisclosure. Bethel Mumaw testified that most such correspondence was routinely thrown away when received. Furthermore, the letters responding to one such inquiry in 1955 contain no indication that W. C. Mumaw had seen them or had been notified of them.[8] Together with Mumaws' testimony that W. C. Mumaw believed his stock to have no market value, this evidence gives rise to a reasonable inference of nondisclosure.
 
 
 44
 The remaining elements of fraud may be dealt with briefly. The materiality of the market value of the stock and of inquiries about purchase of the business is apparent, as is the fact that there was a market for the stock, since holding companies were then in the process of acquiring small telephone companies like Cohassett. Mumaws' knowledge of the market for Cohassett stock may be inferred from their knowledge of purchase inquiries and Henry Mumaw's testimony that he was aware that a majority interest may be more valuable than a minority interest. An intent to obtain reliance may be inferred from the same evidence giving rise to an inference of misstatements during contract negotiations. Such statements are meant to induce reliance. The same evidence suffices for the nondisclosure of purchase inquiries, since such nondisclosure serves the same purpose of inducing a belief that the stock had no market value. W. C. Mumaw's belief that his stock had no market value may be inferred from Mumaws' testimony on this question. The same evidence supports an inference of reliance, because the alleged misrepresentations are a likely source of W. C. Mumaw's erroneous belief. His right to rely may be inferred from the fiduciary obligation that Mumaws may have owed to him. Salter v. Heiser, supra, 36 Wash.2d at 549-54, 219 P.2d at 581-84. See section I.C.1. Supra. Given the preceding, an inference of consequent damage is also reasonable.
 
 
 45
 Hiltons' evidence of common law fraud presents an A fortiori case of equitable fraud. In a broad range of circumstances, the Washington courts impose constructive trusts to remedy wrongdoing:
 
 
 46
 In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, Taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same . . . .
 
 
 47
 Bangasser & Associates v. Hedges, 58 Wash.2d 514, 516-17, 364 P.2d 237, 239 (1961), Quoting 4 J. Pomeroy, Equity Jurisprudence § 1053; Accord, Viewcrest Cooperative Ass'n v. Deer, supra, 70 Wash.2d at 293, 422 P.2d at 834-35; Mehelich v. Mehelich, 7 Wash.App. 545, 549, 500 P.2d 779, 781-82 (1st Div. 1972). Wrongdoing not amounting to common law fraud will permit imposition of a constructive trust. Viewcrest Cooperative Ass'n v. Deer, supra, 70 Wash.2d at 293, 422 P.2d at 834-35; Sorrell v. Young, 6 Wash.App. 220, 224-25, 491 P.2d 1312, 1315 (1st Div. 1971). Since Hiltons' claims of common law fraud must go to the jury, their equitable claims must also await the jury's decision, at least as to factual questions common to both. Ross v. Bernhard, 396 U.S. 531, 537-38, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970) (dictum); Dairy Queen, Inc. v. Wood, 369 U.S. 469, 472-73, 479-80, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962).
 
 
 48
 b. Misrepresentation of reluctance to purchase stock
 
 
 49
 Hiltons also claim that Mumaws engaged in fraud by misrepresenting to W. C. Mumaw that they were not interested in purchasing his stock because it had no market value. To the extent that this claim presents grounds for recovery, it only repeats Mumaw's misrepresentation of lack of market value and nondisclosure of purchase inquiries.
 
 
 50
 Hiltons cite Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), Cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), for the materiality of a representation that an insider was "going to get out" of the business. Id. at 734. However, they do not claim that Mumaws ever represented that they planned to quit the company, but only that they were reluctant to buy W. C. Mumaw's stock. A misrepresentation that they planned to leave Cohassett would undoubtedly have been material, but their stated reluctance to buy stock adds no independent factor to be considered in assessing the value of Cohassett stock.
 
 
 51
 A misstatement that could not reasonably have misled W. C. Mumaw as to the value of his stock also could not have contributed to the unfairness of the contract price. Hence Mumaws' alleged misrepresentation of their state of mind also does not form any independent basis for equitable relief.
 
 
 52
 c. Undue influence
 
 
 53
 Hiltons claim that Mumaws exerted undue influence upon W. C. Mumaw to enter into all three of the contracts involved in this action. As to the 1959 contract, this is Hiltons' only theory of recovery.[9]
 
 
 54
 Mumaws exerted undue influence only if they interfered with W. C. Mumaw's free will and prevented the exercise of his judgment and choice. In re Estate of Reilly, 78 Wash.2d 623, 646, 479 P.2d 1, 15 (1970). Where, as here, Hiltons rely solely upon circumstantial evidence of undue influence, they can avoid a directed verdict only if they present evidence of circumstances inconsistent with the exercise of free will:
 
 
 55
 Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence itself need not be direct. Circumstantial evidence is sufficient. It must, however, Do more than raise a suspicion. It must Amount to proof, And Such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator.
 
 
 56
 Id. at 647, 479 P.2d at 15 (quoting earlier decisions, emphasis in opinion); Accord, In re Estate of Hansen, 66 Wash.2d 166, 172, 401 P.2d 866, 870 (1965).[10]
 
 
 57
 Hiltons rely upon the following evidence of undue influence: that in 1949, Mumaws had pressured W. C. Mumaw for control of Cohassett; that Henry Mumaw initiated the drafting of the 1957 contract in private consultations with Cohassett's attorney; that the initial draft of the 1957 contract was "grossly one-sided"; and that the 1959 contract is also one-sided. The first two of these factors are no more than marginally relevant. Mumaws' attempt to gain control in 1949 was eight years before the first of the disputed contracts was signed, and in any case, W. C. Mumaw possessed sufficient independence to relinquish control no earlier than 1952. Henry Mumaw's consultation with Cohassett's attorney likewise furnishes little evidence that Mumaws interfered with the free will of W. C. Mumaw. The first draft of the 1957 contract also adds little, since the final draft was less favorable to Mumaws. But even apart from this point, the 1957 and 1959 contracts do not provide sufficient evidence of undue influence, since they are as consistent with the absence of undue influence as with its presence. In re Estate of Reilly, supra, 78 Wash.2d at 661, 479 P.2d at 23; In re Estate of Hansen, supra, 66 Wash.2d at 172, 401 P.2d at 870; Cf. Binder v. Binder, 50 Wash.2d 142, 148-50, 309 P.2d 1050, 1053-55 (1957). The Washington Supreme Court has readily found circumstantial evidence of undue influence to be insufficient. In re Estate of Reilly, supra, 78 Wash.2d at 657-64, 479 P.2d at 21-25. We do likewise.
 
 D. State Statutory Claims
 
 58
 The Washington courts have implied a private cause of action for violation of Rev.Code Wash. § 21.20.010,[11] the general antifraud provision of the Washington Securities Act. Clausing v. DeHart, 83 Wash.2d 70, 73, 515 P.2d 982, 984 (1973); Shermer v. Baker, supra, 2 Wash.App. at 847-50, 472 P.2d at 591-92. However, the Washington Securities Act took effect on June 10, 1959. Only the 1959 contract was signed after that date. As we have seen, Hiltons claim only undue influence with respect to that contract and on that claim, they have presented insufficient evidence. See, section I.C.2.c. Supra. Consequently, Hiltons' statutory theory of recovery depends entirely upon the retroactive application of section 21.20.010 to the 1957 and 1958 contracts. This question, in turn, is determined by the savings provision of the Washington Securities Act, Rev.Code Wash. § 21.20.910:
 
 
 59
 Prior law exclusively governs all suits, actions, prosecutions, or proceedings which are pending or may be initiated on the basis of facts or circumstances occurring before the effective date of this chapter, except that no civil suit or action may be maintained to enforce any liability under prior law unless brought within any period of limitation which applied when the cause of action accrued and in any event within two years after the effective date of this chapter.
 
 
 60
 Because no Washington decision has interpreted this section, we have recourse to its statutory context and legislative origins.
 
 
 61
 The Washington Securities Act is a modified enactment of the Uniform Securities Act. Both section 21.20.010 and section 21.20.910 adopt verbatim the language of the corresponding provisions of the Uniform Act. Uniform Securities Act §§ 101, 418(b). Although no official comment explains the savings provisions of the Uniform Act, the drafters of the Act intended them "to smooth the transition from the old law to the new as much as possible." Uniform Securities Act § 418, Draftsmen's Commentary, Quoted in L. Loss & E. Cowett, Blue Sky Law 411 (1958).
 
 
 62
 The Washington Securities Act also adopts without substantial modification the other provisions of the Uniform Act specifying the law applicable to transactions prior to its effective date. Prior registrations are governed exclusively by prior law and offerings on the basis of exemptions under prior law are governed by prior law for a period of one year after the effective date. Rev.Code Wash. §§ 21.20.915, .920; Uniform Securities Act § 418(c), (d).[12]
 
 
 63
 The legislative policy of these provisions clearly is against retroactivity. Even the statutory exception to this policy for offerings exempted by prior law prevents such exempted offerings only from continuing indefinitely into the future.
 
 
 64
 A rule that the Washington Securities Act does not apply to contracts entered into prior to its effective date has much to recommend itself. All activity that may render a contract fraudulent or illegal usually has occurred prior to its formation. Furthermore, since most securities contracts are documented in some form, use of the date of formation allows an efficient and accurate determination of the applicable law. While these reasons are forceful in themselves, they become conclusive in light of the two purposes of section 21.20.910: first, to apply prior law to prior facts; and second, to smooth the transition from prior to present law.
 
 
 65
 Hiltons argue for a contrary conclusion, relying upon the broad prohibition of section 21.20.010 against fraudulent practices "in connection with the offer, sale or purchase of any security." They argue that this language applies to the performance of the 1957 and 1958 contracts, even if it does not apply to the contracts themselves. We cannot accept this argument. First, it yields the self-contradictory conclusion that a contract itself free from fraud may, solely through its performance, become fraudulent. This contradiction creates more than logical difficulties. It unforeseeably defeats the expectations of parties contracting prior to the effective date. Such a result hardly eases the transition from prior to present law. Second, Hiltons' argument leaves unexplained the command of section 21.20.910 that prior law "exclusively" governs suits on the basis of facts prior to the effective date. The statute envisages a sharp distinction: transactions prior to the effective date are governed solely by prior law. We will not defeat this legislative policy by holding that the legality of a contract at its formation is governed by prior law, while its legality during performance is governed by present law. We conclude that the Washington Securities Act applies to neither the 1957 nor the 1958 contract.
 
 E. Claims under SEC Rule 10b-5
 
 66
 As with Hiltons' state law claims, we consider Mumaws' alleged misrepresentation of reluctance to buy W. C. Mumaw's stock only on the merits. Hiltons assert no Rule 10b-5 claim with respect to the 1959 contract. See section I.C.2.c. Supra.
 
 1. Statute of Limitations
 
 67
 Hiltons' Rule 10b-5 claims raise the same statute of limitation questions as their common law and equitable fraud claims. We decide them in the same way and on similar reasoning.
 
 
 68
 The statute of limitations governing actions under Rule 10b-5 is the state statute of limitation for fraud actions generally. United California Bank v. Salik, 481 F.2d 1012, 1014-15 (9th Cir.), Cert. denied, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973); Douglass v. Glenn E. Hinton Investments, Inc., 440 F.2d 912, 914-16 (9th Cir. 1971). Hence the applicable limitation is the three-year limitation of Rev.Code Wash. § 4.16.080, the statute discussed at length in section I.C.1. Supra. However, federal law determines when the limitation begins to run. This is true even though the federal rule that the period commences when the plaintiff discovered the fraud or could have done so in the exercise of reasonable diligence is similar, if not identical, to the Washington rule. United California Bank v. Salik, supra, 481 F.2d at 1014-15 & n. 7 (dictum); Douglass v. Glenn E. Hinton Investments, Inc., supra, 440 F.2d at 916 (dictum); See Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 90 L.Ed. 743 (1946); Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 83-86 (2d Cir.) (Friendly, J.), Cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961).[13] The question when Hiltons discovered the fraud or had a reasonable opportunity to do so is for the trier of fact. See Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1210 (9th Cir. 1970). The federal courts have given weight to the same factors as the Washington courts. DeHaas v. Empire Petroleum Co., 435 F.2d 1223, 1226 (10th Cir. 1970); Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 9 (5th Cir. 1967). See section I.C.1. Supra. Accordingly, the district court could not properly direct a verdict that Hiltons' claims are barred by the statute of limitations.[14]
 
 2. The Merits
 
 69
 a. Misrepresentations as to market value and failure to disclose purchase inquiries
 
 
 70
 Mumaws first argue that Hiltons have failed to show that the allegedly fraudulent acts involved "the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . in connection with the purchase or sale of any security." SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. We cannot agree.
 
 
 71
 A draft of the 1957 contract was mailed by Cohassett's attorney to Henry Mumaw. The jurisdictional requirement of Rule 10b-5 is satisfied even if the use of the mails is not itself a fraudulent act. It suffices if Mumaws used the mails in furtherance of the alleged fraud. Errion v. Connell, 236 F.2d 447, 450, 454-55 (9th Cir. 1956); Boone v. Baugh, 308 F.2d 711, 713-14 (8th Cir. 1962). From the fact that the draft was mailed with a covering letter to Henry Mumaw, it may reasonably be inferred that the draft was prepared at his request. Preparation of the draft was clearly in furtherance of the allegedly fraudulent scheme. We conclude that the use of the mails by Cohassett's attorney satisfies the jurisdictional requirement of Rule 10b-5.
 
 
 72
 We need not discuss at length the other elements of a Rule 10b-5 claim, since the extent of the duty imposed by that rule is not put in issue by Mumaws' motion for directed verdict at the close of Hiltons' case-in-chief. Although the district court must eventually formulate jury instructions that specify the duty owed by defendants under the different facts that may reasonably be found by the jury, White v. Abrams, 495 F.2d 724, 734-36 (9th Cir. 1974), it need not consider the duty imposed upon Mumaws in deciding a motion for directed verdict at the close of Hiltons' case-in-chief, Id. at 729-30. Hiltons present sufficient evidence that Mumaws violated the duty imposed by Rule 10b-5 if they show misstatement or nondisclosure of a material fact in connection with the purchase or sale of any security. Id.; Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962). As our discussion of Hiltons' common law fraud claims makes clear, Hiltons have presented evidence from which the jury could reasonably infer misstatement or nondisclosure of a material fact. See section I.C.2.a. Supra. The same discussion shows A fortiori that they have presented sufficient evidence of the remaining elements of a Rule 10b-5 claim. White v. Abrams,supra, 495 F.2d at 729-32; Royal Air Properties, Inc. v. Smith, supra,312 F.2d at 212; Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961).
 
 
 73
 b. Misrepresentation of reluctance to purchase stock
 
 
 74
 This alleged misrepresentation may also be disposed of on the basis of reasons stated earlier. As discussed in section I.C.2.b. Supra, Mumaws' alleged misrepresentation of their reluctance to enter into the 1957 and 1958 contracts does not add an independent ground of misrepresentation. Cf. Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).
 
 
 75
 We reverse the directed verdict and remand for further proceedings as to claims of common law and equitable fraud and Rule 10b-5 violations resulting from misrepresentations of market value and failure to disclose purchase inquiries. We affirm the directed verdict as to all remaining claims.
 
 II. The Cross-Appeal
 
 76
 Following Hiltons' appeal from the directed verdict, Mumaws cross-appealed from the earlier denial of their motion for summary judgment. We first decide whether we have jurisdiction over the cross-appeal.
 
 
 77
 An otherwise nonfinal order may become cross-appealable upon the entry of a final order. See Peoria & Pekin Union Ry. v. United States,263 U.S. 528, 535-36, 44 S.Ct. 194, 68 L.Ed. 427 (1924). Nor does it lack cross-appealability because the final order from which the direct appeal was taken was entirely favorable to cross-appellants. The risk that they might become aggrieved upon reversal on the direct appeal is sufficient. See id.; 9 J. Moore, Federal Practice P 203.06, at 717 (1973). Here, Mumaws could have been aggrieved by the denial of their motion for summary judgment if the directed verdict in their favor was reversed on an issue upon which they should have been granted summary judgment. Finally, Hiltons argue that Mumaws' notice of cross-appeal is not timely because its timeliness must be determined from the date of entry of the order denying summary judgment. However, the denial of summary judgment did not become cross-appealable until entry of the judgment for Mumaws on the directed verdict. If timeliness is determined from entry of that order, Mumaws' cross-appeal was timely. We conclude that it was.
 
 
 78
 The sole purpose of Mumaws' cross-appeal is to obtain our consideration of the affidavits and other evidence submitted in support of their motion for summary judgment. They concede that "(e)ssentially the same facts were shown by the defendants in their motion for summary judgment as are shown by plaintiffs at trial" and they nowhere argue that summary judgment in their favor on an issue would be proper even if a directed verdict in their favor would not. Accordingly, as to issues upon which we reverse the directed verdict, we affirm the denial of summary judgment. As to issues upon which we affirm the directed verdict, we dismiss the cross-appeal as moot.
 
 
 79
 Affirmed in part; reversed and remanded in part.
 
 
 
 *
 Honorable Joe McDonald Ingraham, Senior United States Circuit Judge, Fifth Circuit, sitting by designation
 
 
 [1]
 Continental Telephone Corp. was originally joined as a defendant, but was subsequently dismissed by stipulation
 
 
 [2]
 Indeed, federal determination of Mumaws' liability under Rule 10b-5 could not possibly present a threat of conflicting adjudications, since state courts lack jurisdiction over such claims. Securities Exchange Act of 1934 § 27, As amended, 15 U.S.C. § 78aa
 
 
 [3]
 The 1959 contract presents a different question. However, since we hold that Hiltons presented insufficient evidence to recover on their claim with respect to the 1959 contract, See section I.C.2.c. Infra, we need not reach the res judicata question as to that claim
 
 
 [4]
 As to the 1959 contract, See note 3 Supra
 
 
 [5]
 The Washington courts have interpreted similar language in the general statute of limitations for fraud actions to require the exercise of diligence in the discovery of the fraud. See section I.C.1. Infra. We have found no Washington decision interpreting section 4.16.110(2) to require diligence, but even assuming that it does, Hiltons have presented sufficient evidence. See section I.C.1. Infra
 
 
 [6]
 Mumaws did not argue below and do not argue here that section 4.16.080(4) has been supplanted by Rev.Code Wash. § 21.20.910, Quoted in section I.D. Infra, providing a limitation for certain securities actions initiated on the basis of facts or circumstances occurring before June 10, 1959, the effective date of the Washington Securities Act. Accordingly, we deem them to have waived whatever defense they may have had on the basis of this statute
 
 
 [7]
 Reeves v. John Davis & Co. also states that plaintiff's burden of proving diligence is not met by evidence of a fiduciary relationship and evidence of the underlying fraud. 164 Wash. at 294-95, 2 P.2d at 735. This statement, however, is dictum, since the case holds only that proof of a fiduciary relationship does not relieve plaintiff of the burden of proving diligence. Id. at 291-94, 2 P.2d at 733-35. The Washington Supreme Court appears tacitly to have abandoned this dictum in Viewcrest Cooperative Ass'n v. Deer, 70 Wash.2d 290, 295, 422 P.2d 832, 835 (1967), and Arneman v. Arneman, 43 Wash.2d 787, 800, 264 P.2d 256, 264 (1953) (alternate holding)
 
 
 [8]
 Mumaws assert that other evidence requires an inference of disclosure of the 1955 correspondence. They rely upon their own testimony that the correspondence was disclosed. However, the testimony of both on this question was impeached by statements that they lacked a specific recollection of disclosure. But even absent impeachment, the jury is not required to believe their testimony
 
 
 [9]
 Hiltons' position with respect to the 1959 contract is somewhat obscure. However, they admit that it was not a stock transaction at all, but an exchange of notes of Cohassett due in 1962 for notes of Mumaws due as late as 1988, without interest until that time. Since this is the position taken by Hiltons in their briefs on appeal, we will not treat the 1959 contract as an agreement for the sale of stock. Consequently, the only fraud charged by Hiltons that is relevant to the 1959 contract is Mumaws' alleged exercise of undue influence
 
 
 [10]
 Hiltons cite McCutcheon v. Brownfield, 2 Wash.App. 348, 356-57, 467 P.2d 868, 873-74 (1st Div.), Review denied, 78 Wash.2d 993 (1970), for the proposition that the existence of a fiduciary obligation shifts the burden onto defendants of proving an absence of undue influence. The statements in the opinion to this effect, however, are dicta, since the burden of proof in that case may have shifted only because of additional evidence in the record of undue influence, in particular, the grantor's impaired mental condition. Id. at 357-59, 467 P.2d at 874. But in any case, the later decision of the Washington Supreme Court in In re Estate of Reilly, 78 Wash.2d 623, 647, 663-64, 479 P.2d 1, 8, 15, 24-25 (1970), has severely limited the availability of the presumption of undue influence. Hiltons have presented no evidence here that surpasses the evidence held insufficient in Reilly to shift the burden of proof. Id. at 657-64, 479 P.2d at 21-25; See id. at 694-95, 479 P.2d at 42-43 (Finley, J., dissenting)
 
 
 [11]
 It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
 (1) To employ any device, scheme, or artifice to defraud;
 (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 (3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
 Rev.Code Wash. § 21.20.010.
 
 
 [12]
 Section 21.20.920 adopts Uniform Securities Act § 418(d) without change:
 Prior law applies in respect to any offer or sale made within one year after the effective date of this chapter pursuant to an offering begun in good faith before its effective date on the basis of an exemption available under prior law.
 Section 21.20.915 contains different language and additional provisions, but does not alter the policy against retroactivity of Uniform Securities Act § 418(c).
 All effective registrations under prior law and all conditions imposed upon such registrations remain in effect so long as they would have remained in effect if they had become effective under this chapter. They are considered to have been filed, entered, or imposed under this chapter. All dealers who are duly registered as brokers and all salesmen and issuers' agents who are duly registered as agents under said securities act, mining act or oil and mining leases act, on the effective date of this chapter shall be deemed to be duly registered under and subject to the provisions of this chapter, such registration to expire on the 30th day of June of the year in which this chapter becomes effective and to be subject to renewal as provided in this chapter.
 Rev.Code Wash. § 21.20.915.
 All effective registrations under prior law, all administrative orders relating to such registrations, and all conditions imposed upon such registrations remain in effect so long as they would have remained in effect if this act had not been passed. They are considered to have been filed, entered, or imposed under this act, but are governed by prior law.
 Uniform Securities Act § 418(c).
 
 
 [13]
 Our decision in Errion v. Connell, 236 F.2d 447, 455-56 (9th Cir. 1956), does not hold to the contrary, since the state rule applied in that case to determine when the limitation began to run was identical to the federal rule. As the cases cited in the text make clear, the great weight of authority requires the application of federal law
 
 
 [14]
 Although otherwise in point, the decision in Chiodo v. General Waterworks Corp., 380 F.2d 860, 867-68 (10th Cir.), Cert. denied, 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967), is distinguishable because, first, the buyer there was not affiliated with the company to be sold and hence owed no fiduciary obligation to the seller, and second, the seller was the present and longtime manager of the company. Id. at 862-63, 867-68